KAREN COLLEEN EATON, Plaintiff-Appellant, *v.* EARL EATON *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 76-151

Opinion filed June 22, 1977.

Ernest K. Koehler, of Chicago, for appellant.

Greenberger, Krauss & Jacobs, of Chicago, and Carponelli, Masucci & Krug, of Arlington Heights (James T. Ryan and Robert Krug, of counsel), for appellees.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

This appeal involves a dispute over custody of two children, one born on December 31, 1969, and the other on May 24, 1971. The contestants are

the mother (Karen) and the paternal grandparents (the Eatons). The father of the children, Thomas Eaton, and Karen were married in March 1969; their marriage was dissolved in May 1974, under the Florida "No Fault" statute. At the time of the dissolution, Karen gave custody of the children to their father.

Shortly after the dissolution, the father and his two children moved to Illinois; they resided with the Eatons in their home in Wheeling, Illinois, until May 1975, when they moved to their own apartment. On July 16, 1975, the father was accidentally killed.

When their son died, the Eatons took the grandchildren to their home. Karen learned of her former husband's death shortly after it occurred, and she immediately traveled from Florida to Wheeling, planning to take her children back to Florida to live with her. The Eatons refused to permit her to have the children or to see them. The stage for this proceeding was set by a petition for writ of habeas corpus Karen filed on July 22, 1975, against the Eatons for physical custody of the children. On the same day, Earl Eaton, the paternal grandfather, filed a petition to be appointed guardian of the childrens' estates and persons. Nine days later, Karen's mother, Hope Burke, who also lives in Wheeling, filed a petition to be appointed guardian of the estates. The three petitions were consolidated for trial in the probate division of the circuit court. The circuit court denied the petitions of Karen and her mother, and granted the Eatons' petition. The court also granted visitation rights to Karen limited to Cook County, Illinois.

Witnesses included psychiatrists, psychologists, attorneys and Karen's neighbors in Florida, as well as Wheeling neighbors of the Eatons. Four witnesses—a marriage counselor who was advising Karen prior to her divorce, the attorney who represented Karen's former husband in obtaining the divorce, and two of Karen's former Florida neighbors— were brought from Florida at the Eatons' expense and testified on their behalf. Although the testimony was lengthy, the conflict and inconsistencies which it developed were minor.

Karen married at the age of 17; her husband was 8 years her senior. During their marriage, Thomas was in the U. S. Navy, and he and Karen frequently moved from base to base. Thomas was often away at sea for intervals of 6 days to 6 months. In 1973, Thomas was under the care of a psychiatrist, and Karen was experiencing difficulty coping with her children and her husband's absences. She consulted a marriage counselor and psychologist from April to October 1973. Karen left the marital home in Jacksonville, Florida in February 1974, entrusting the children to the care of her husband.

Jeanne Eaton, the paternal grandmother, arrived at her son's home in Florida on February 17, 1974, shortly after Karen left. Mrs. Eaton found

the children's bedroom in what she characterized as a deplorable condition, with a pervasive odor of urine, a missing window screen, no curtains and no protective covers on the electrical sockets. Jeanne Eaton's daughter-in-law, Barbara, arrived at the home in Florida about 5 days after Mrs. Eaton's arrival while her mother-in-law was still there. She found the conditions observed by Mrs. Eaton when she arrived only partially corrected; she testified that molding from around the ceiling and the baseboard from the children's room was lying in the hallway with nails exposed and that there was writing on the hallway walls. The evidence is inconclusive as to the extent that Karen was responsible for these conditions.

Mrs. Lilly, Karen's next-door neighbor in Jacksonville, testified that Karen locked her children in their rooms. This was done during their naps or to punish them or to keep them from running around the house while Karen was napping. Mrs. Lilly stated that Karen punished the children frequently and that she often heard the children screaming. She assumed Karen was spanking her children, but never saw them being spanked. On one occasion, Karen chained her younger child to a carport by attaching a dog chain to a strap she put around the child's body. Mrs. Lilly was not asked whether Karen kept her home clean.

Karen explained why she acquiesced in her husband having custody of her children at the time her marriage was dissolved by her testimony that she was unhappy and confused when she left her husband and children, and needed time to "get herself together." She also testified she felt her children would be better off with her. She stated, however, that her husband suffered from depression and she feared that if she took the children away from him, it would be such a blow to him that he might commit suicide. She testified that during this period her husband told his mother he had a bottle of pills and wanted to take them.

During the last few months Karen resided in the marital home, she was seeing another man who visited her frequently in her home while her husband was away. When Karen left in February 1974, she moved to an apartment that this man maintained, and shared it with him for a time. After the dissolution of her marriage, Karen lived as a single woman and had male friends. Over the objection of her attorney, she was required to testify about these relationships.

For most of the time after her marriage was dissolved, Karen was employed. For part of the time she worked as a daytime bartender in a lounge featuring topless dancers, and occasionally she worked at the door of that lounge at night. She also worked in another lounge as a bartender and relief cocktail waitress, and was employed as a salesclerk in a fabric store.

After her marriage was dissolved, Karen moved from Jacksonville,

Florida to Miami. She kept a loaded gun in her Miami apartment, explaining it was for self-protection because there had been a large number of robberies in the area. A neighbor in Miami testified that Karen smoked marijuana on occasion in her apartment, but she denied this.

Mrs. Eaton took the children back to Wheeling in February 1974, and returned to Jacksonville with the children in May 1974 when the marriage was dissolved. Karen visited with her children for 1 day, and Mrs. Eaton then flew back to Wheeling with the children, who never again returned to Florida. Karen's only communication with her children after her May 1974 visit with them until the latter part of 1974 was two letters she wrote. She testified that it was her understanding at the time of the marriage dissolution that her husband would remain in Florida with the children.

Karen returned to Jacksonville from Miami in August 1974, and attempted to contact her former husband and children. She learned that their former home had been sold and that her husband and children no longer were living there. She wrote to her former husband in December 1974 inquiring about the children, and advising him she would call long distance to speak with her children. She called on Christmas Eve, 1974, but Mrs. Eaton, after berating Karen, hung up the phone without letting Karen speak with the children. Karen then consulted her attorney, who contacted her former husband's attorney. A few days later Karen made a second call, and was allowed to speak with her children. Karen sent her mother a check to use for purchasing Christmas presents for the children. Karen testified she tried to make monthly long distance calls to her children in 1975, and perhaps sent two letters to them. She flew to Wheeling in March 1975 to visit with her children. However, her former husband permitted her to see them only during several weekend periods. In early July 1975, Karen sent paid airplane tickets to her former husband for the children to visit with her in Florida. He refused to permit the children to go.

Karen called as a witness a qualified psychologist who testified that she is not only fit, but able and willing to love and nurture her children and care for them as a mother. She also presented evidence that she was financially able to support the children, that she was debt-free and totally self-supporting, and that she could provide an adequate home.

Mrs. Eaton questioned whether Karen truly loved her children. However, she conceded that each human being loves in his own particular way, and Karen loved her children in her own way.

■■■ The essential policy consideration in determining custody is the best interest and welfare of the child. (*In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820, No. 48536, filed May 20, 1977; *Chodzko v. Chodzko* (1976), 66 Ill. 2d 28, 360 N.E.2d 60; *People ex rel. Edwards v. Livingston* (1969), 42 Ill. 2d 201, 209, 247 N.E.2d 417; *Giacopelli v. Florence*

*Crittenton Home* (1959), 16 Ill. 2d 556, 565, 158 N.E.2d 613.) Also applicable to this case is the legislative command in section 132 of the Probate Act (Ill. Rev. Stat. 1975, ch. 3, par. 132), that if one parent is dead and the surviving parent is competent to transact his own business and is a fit person, he is entitled to custody of his minor children. *People ex rel. Edwards* held that the right of the natural parent provided for by that statute must yield to the best interest of the child even though the parent is a fit person. Although not articulated by the court, the reason for this construction of the statute appears to be that the statute also provides that "for good reason" the court may grant custody to some person other than the natural parent. As we construe the statute, it places on a person seeking custody in place of the surviving parent the burden of establishing that taking custody from the natural parent would be in the best interest of the child. The following cases which declare a presumption that the interest and welfare of a child are best served in the custody of its natural parent when the parent is fit and can provide the necessities of life are consistent with the statutory provision that "for good reason" the court may grant custody "to some other person:" *People ex rel. Karr v. Weihe* (1961), 30 Ill. App. 2d 361, 373-374, 174 N.E.2d 897; *Jarrett v. Jarrett* (1952), 348 Ill. App. 1, 6, 107 N.E.2d 622; *People ex rel. Yarmulnick v. Hoff* (1944), 323 Ill. App. 535, 541, 56 N.E.2d 324; *People ex rel. Good v. Hoxie* (1912), 175 Ill. App. 563, 567; *Wohlford v. Burckhardt* (1908), 141 Ill. App. 321, 324-25. The burden of proving a natural parent is unfit also has been placed on a person seeking custody in place of the natural parent. *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302, 304, 216 N.E.2d 229; *People ex rel. Yarmulnick*, at 542.

Moreover, the use of the present tense in the statutory language referring to the surviving parent's fitness indicates that the surviving parent's fitness at the time of the death of the parent who had custody of the child is determinative rather than his fitness at the time custody was awarded to the parent who subsequently died. *In re Estate of LeCocq* (1974), 17 Ill. App. 3d 1011, 1014, 309 N.E.2d 84.

■■ In a custody proceeding, the trial court which has observed the witnesses must be given broad discretion to reach a just determination. (*In re Stilley.*) This court, while acknowledging the broad discretion in the trial court, has announced recently that this discretion is not unlimited, but is subject to review and will be reversed if exercised in a manner contrary to the manifest weight of the evidence. (*Comiskey v. Comiskey* (1977), 48 Ill. App. 3d 17, 366 N.E.2d 87.) This is consistent with *People ex rel. Edwards*, strongly relied on by defendants, where the judgment of the trial court granting custody to the natural father after the mother's death was reversed, and it is not inconsistent with *Stilley.*

■■ Applying the principles of law reviewed above as well as the

statute to the evidence presented in this case, we conclude that the Eatons failed to prove that the best interest and welfare of the children would be served by awarding custody to them instead of to Karen, or that Karen was unfit at the time of her former husband's death. Consequently, it was against the manifest weight of the evidence for the circuit court to grant custody to the Eatons and deny custody to Karen.

There is neither a specific finding by the circuit court that Karen was an unfit person at the time of her former husband's death nor evidence which would support that conclusion. Karen conceded that during the last months of her marriage, she was experiencing emotional problems. Her husband received custody of the children even though he too had similar problems at the time. The reason Karen gave up custody to her husband is not dispositive of the decision which now has to be reached. Karen's problems at the time of her divorce do not disqualify her for all time from being regarded as a fit parent or from receiving custody of her children. (*Nye v. Nye* (1952), 411 Ill. 408, 415, 105 N.E.2d 300; *LeCocq*, at 1014-1015.) Emotional problems which plagued Karen during her marriage do not militate against her later receiving custody, if they have been resolved in the meantime. (*Corcoran v. Corcoran* (1967), 79 Ill. App. 2d 328, 333, 224 N.E.2d 611.) Karen testified that when she left the marital home in February 1974, she needed time to pull herself together and that she had succeeded in accomplishing that. We believe that the record, particularly in view of the testimony of the psychologist called as her witness, establishes that Karen overcame whatever problems were bothering her a year earlier.

Although Karen was guilty of an indiscreet relationship prior to the dissolution of her marriage, it does not bar her from custody of her children. (*Nye.*) After the dissolution, she lived as a single woman and neither her friendship with men nor her effort to build a new life for herself make her ineligible for custody of her children. Neither do her employment as a cocktail waitress and a bartender; her possession of a gun, in view of her reason for having it; or her disputed occasional use of marijuana. If the roles here were reversed and a father was seeking custody after the death of a mother, his friendships with the opposite sex and employment similar to Karen's would, we are confident, be given little attention.

The Eatons also were critical of Karen because of her failure to show sufficient interest in and concern for her children. Although Karen testified her only contact with her children between May and the latter part of 1974 was by two letters she wrote them, this is explained by her need to cure her own emotional problems. Her interest in her children is established by the efforts she made to contact them commencing in December 1974, the presents she sent them at Christmas 1974, her trip to

Chicago in March 1975 for the purpose of visiting with her children and the money she sent for tickets for her children to travel to Florida in the early part of July 1975, as well as some telephone calls and letters to the children in 1975. These facts are unlike those in *People ex rel. Edwards* and *Giacopelli* where custody was withheld from natural parents because of their insufficient concern for a child. In the former case, a father who lived only 30 miles from his son made no effort to see him for 11 years or to contribute to his support. The conduct of the mother in *Giacopelli* in pursuing a preconceived plan to forego all parental duties and relinquish all parental claims to the child by giving her newborn baby up for placement and adoption was held to constitute abandonment.

The Eatons' effort to show that Karen mistreated her children was not established by the testimony they offered. Mrs. Lilly, Karen's next-door neighbor in Jacksonville, testified that she believed Karen spanked her children in order to discipline them, and that there was a great deal of screaming and noise in Karen's home. Although this may not be an ideal way of upbringing, it probably is not dissimilar to what happens to children in many homes. Nor is Karen's practice, testified to by Mrs. Lilly, of occasionally disciplining her children by locking them in their room. The one incident that Mrs. Lilly described when Karen restrained her younger son by tying him to a carport with a dog chain attached to a strap around his waist so that he could not wander away does not constitute mistreatment. Nor do the isolated incidents testified to by the Eatons and their daughter-in-law, Barbara, regarding Karen's conduct toward her children.

The Eatons charged that Karen neglected her housekeeping responsibilities. However, the only evidence relating to this criticism of Karen was the condition of the home when Mrs. Eaton came to Florida in February 1974 after Karen had already departed from the premises. The Eatons agreed that in previous years when they visited Karen at her home they found nothing substantially wrong with the manner in which she maintained it. Her next-door neighbor, Mrs. Lilly, was not even asked by the Eatons' attorney, who called her as a witness, if Karen had shortcomings as a housekeeper. The record fails to show how long after Karen's departure from the Jacksonville home in February 1974 Mrs. Eaton arrived; thus, it is not clear whether at least some of the conditions which Mrs. Eaton described might have developed after Karen left, or were in part attributable to Thomas Eaton.

There is no doubt that the Eatons are well intentioned. They provided their grandchildren with a stable home environment, financial security, and love and affection before and after the dissolution of the marriage as well as in the months following Thomas Eaton's death. They are to be commended for their efforts and their interest in their grandchildren, and

if custody were awarded to them, they would do their utmost to provide a good home for them and raise them in a proper manner. However, because the Eatons failed to show that Karen is unfit or that, in the language of the statute, there is good reason for them to have custody rather than Karen, we conclude that the best interest and welfare of the children is for them to be raised by their mother.

Absent a showing of parental unfitness or other good reason, the law presumes it is in the child's best interest to be raised by a natural parent rather than other relatives or outsiders. As the court observed in *People ex rel. Edwards,* the "best interest of a child" standard "is not always easily applied." This is because after the issue of the respective fitness of the contesting parties is resolved, the "best interest of a child" test must of necessity be grounded more in the prospects for the future than in existing circumstances. The court in *People ex rel. Edwards* also stated that in applying the "best interest of the child" standard the facts and circumstances of each case must be considered. (42 Ill. 2d 201, 209.) In this case, in addition to the presumption which the law establishes, the record shows that Karen is emotionally stable, self-supporting and in a financial position to support her children, and also capable of providing an adequate home and a loving environment for them. Other things being equal, we believe that the best interest of the children will be served by their living with their mother who is nearer their age than the Eatons, who are almost half a century old. A small indication of the problems which may be posed in the future by the age discrepancy between the grandparents and grandchildren is that Mr. Eaton has a mild case of diabetes and Mrs. Eaton has a mild case of arteriosclerosis. No one can foretell how they will be affected by these ailments as they grow older.

We acknowledge as the court did in *Comiskey,* and as the court cautioned us to do in *Stilley,* that the trial court has had the opportunity to observe the demeanor and conduct of the parties and the witnesses. Yet our review of the testimony and of the arguments presented causes us to conclude that the best interest and welfare of the children lies with being raised by their mother, and that the order of the circuit court awarding custody of the children to the Eatons is contrary to the manifest weight of the evidence. Therefore, the judgment of the circuit court giving custody of the person of the minors to the defendant Earl Eaton and denying the petition of plaintiff Karen Eaton for their custody must be reversed.

In regard to the estates of the minors, it appears that Karen has not petitioned to be appointed guardian because she is not a resident of Illinois. Karen's mother, Hope Burke, filed a counterpetition for guardianship of the estates of the children. Karen concedes the reason for her mother's petition was that the children, as sole heirs of their father, had survival rights in a potential tort claim, and Mrs. Burke was an Illinois

resident while Karen was a resident of Florida. In all probability, the children and Karen would have lived in Florida had she been awarded their custody. If Karen were to remain a resident of Illinois, the sensible resolution of this matter would be to award her guardianship of the estates of her children as well as custody. However, between Hope Burke and the Eatons, we see no preference in awarding the guardianship of the estate of the children to either, and no reason, therefore, to disturb the judgment of the trial court in that aspect of the case. The judgment awarding guardianship of the estates of the minor children to Earl Eaton is affirmed.

Affirmed in part, reversed in part.

McNAMARA and McGILLICUDDY, JJ., concur.