RAYMOND E. BURRIS, Petitioner-Appellant, *v.* JANICE L. BURRIS, Respondent-Appellee.

Fifth District ˙ No. 78-137

Opinion filed March 15, 1979.

JONES, J., dissenting.

Peek and Gandy, of DuQuoin, for appellant.

Jack Ver Steegh, of Land of Lincoln Legal Assistance Foundation, Inc., of East St. Louis, for appellee.

Mr. JUSTICE KUNCE delivered the opinion of the court:

This is an appeal from an order entered by the Perry County Circuit Court denying a father's petition to modify his divorce decree by awarding him child custody.

The petition alleged that a decree of divorce was entered December

13, 1974; that subsequent to the entry of the decree, material changes in circumstances ocurred; and that the court should award the father, Raymond E. Burris, custody of the parties' two children, Tracy, an 11-year-old daughter, and Alex, a 7-year-old son. Only one such change is pressed in this appeal, namely "that Respondent, Janice L. Burris, has taken up residence with a male person known as O. J. Weston, and is continuing to reside with him without the benefit of marriage."

The children have resided with respondent since the divorce. Until immediately before the hearing in November 1977, respondent was unemployed. She initially attempted to support herself and her children with child support payments from Mr. Burris. Since August of 1975, respondent and the children have been supported primarily by Mr. Weston. One week prior to the hearing, respondent began employment at a drug store.

Respondent described Weston's home as having three bedrooms, a living room, a large kitchen, a utility room and bath, a full basement and an attic. Apparently when she first moved in with Weston, his home had only one bedroom; two bedrooms were subsequently added.

Respondent admitted that she and Weston live together as husband and wife and that they share the same bed, but she testified they have no plans to marry. At one point during her testimony, she stated that she intends to move out of Weston's home when she can support herself and the children and that she hopes to be able to move herself and the children to Belleville. However, she also said that she had considered her living arrangement with Weston to be permanent until "the custody matter" came up. Thus, it is not clear what respondent's intentions are so far as her future with Weston is concerned.

Weston owns the home in which they reside. Weston is divorced and has one child who neither lives with nor visits him. He is employed as a heavy equipment operator, is usually home when the Burris children return from school, and frequently baby-sits with them.

Both Mr. and Mrs. Burris testified about their children. Tracy has suffered from an asthmatic or allergic condition for the last two years. There appeared to be some dispute between her parents over her being treated by a Carbondale physician; however, it also appeared that her condition is being controlled. Alex has a history of poor school work but has shown some improvement. Both parents testified that they had been working with Alex on his lessons. Respondent described Alex as a "nervous child" and stated that one week prior to the hearing, Alex's school had recommended that he be seen by the school psychologist.

Mr. Burris testified that he had remarried since the divorce and that his new wife has three daughters. Together they have had one son. He now resides with his new wife and their four children. Their home, which

is situated on five acres, contains three bedrooms, a living room, a den, a kitchen, a bath, a back porch and a full basement.

Subsequent to his divorce, Burris became disabled and began receiving social security benefits. He suffers from a blinding eye disease; however, his physician has indicated his vision could improve. His social security benefits amount to $550 per month. Prior to becoming disabled, he worked as a miner, earning approximately $1,000 per month, net.

Burris testified that he did not approve of the living arrangement for Tracy and Alex. Although he stated that he could tell that the children were "troubled" by their mother's living arrangement with Weston, the only problems shown by the evidence were the children's feelings, in Burris' opinion, of "having no roots," Tracy's allergy condition, and Alex's nervous behavior and poor school work. There was no evidence that any of these difficulties had been brought about by the children's living with their mother and Weston. In fact, Burris stated that he believed the children loved their mother and, further, that respondent can be a good mother "when she puts her mind to it." Regarding Weston, Burris stated that he didn't "have anything against him other than the fact that he run with my wife when we were married."

Having heard the evidence summarized above, the trial court found that there had been a substantial change in circumstances but that the change was not such to require a change of custody to Mr. Burris in the best interests of the children. The issue presented is whether the trial court's conclusion was palpably erroneous. *Anderson v. Anderson* (1975), 32 Ill. App. 3d 869, 336 N.E.2d 268.

In announcing its decision, the trial court said:

"I agree that what this boils down to is a question of whether or not Mrs. Burris' living arrangement constitutes sufficient reason to justify a change of custody.

From the testimony I have heard this afternoon there has been absolutely no showing that the children are not being provided for in their present living arrangement. In fact, Mr. Burris, I believe when he testified indicated that he couldn't say too much against Mr. Weston as far as how he has provided for the children, *While there is no doubt that my personal code of morality might well be different from Mrs. Burris' I don't think I can let that enter into my decision.*

\* \* \*

While it is certainly not of Mr. Burris' making he does have a problem, of course with his sight. He [*sic*] has affected his income and at this time apparently he is not certain whether it is going to be a permanent disability or a temporary disability. It is something that must be taken into consideration. As Mrs. Burris' living

situation is one thing that must be taken into consideration, I think when we take all things together I cannot say this afternoon that there has been sufficient showing to justify a change of custody * * *."

■■ The law has long been that the burden is on the proponent of a change in child custody to prove that a material change in circumstances has occurred subsequent to the prior custodial determination and that such change demonstrates that a change in custody would be in the best interest of the children. (*Vanderlaan v. Vanderlaan* (1972), 9 Ill. App. 3d 260, 292 N.E.2d 145.) This guide has now been codified in the new Marriage and Dissolution of Marriage Act, which specifically directs, with regard to a petition to modify a custodial provision, that the court shall retain the prior custodian unless "* * * the child's present environment endangers seriously his physical, mental, moral or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him." Ill. Rev. Stat. 1977, ch. 40, par. 610(b)(3).

As for parental unfitness, Illinois has often allowed mothers whose behavior might be deemed questionable to retain custody of their children where there was no evidence that the mother's behavior was detrimental to the child's welfare. (*Fears v. Fears* (1972), 5 Ill. App. 3d 610, 283 N.E.2d 709; *Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 364 N.E.2d 566; *Christiansen v. Christiansen* (1975), 31 Ill. App. 3d 1041, 335 N.E.2d 581.) In *Fears*, we reversed a custody change ordered by the trial court which was based on the fact that the custodial mother used marijuana. We said:

"[I]n the absence of any showing that this interfered with her ability to properly care for the child, such use demonstrated a mistake in judgment and does not in and of itself indicate unfitness." 5 Ill. App. 3d 610, 614, 283 N.E.2d 709, 712.

*Hendrickson* involved a custodial mother who had frequently permitted her boyfriend to spend the night in her home. There was no testimony indicating the children were in any way neglected by the mother or unhappy in the present circumstances. The *Hendrickson* court said:

"Our censorship of the respondent's conduct, however, can properly relate only to its effect on the children * * *. [T]heir sexual relationship, if any, is not relevant here unless it be shown as having a negative effect on the children." 49 Ill. App. 3d 160, 163, 364 N.E.2d 566, 569.

In *Christiansen*, the trial court had awarded custody to a mother who was living with a man who was married to another woman. The father appealed, contending that this fact made the mother unfit. The reviewing court, unable to find anything in the record to indicate that the mother's

living arrangement was adversely affecting the children, affirmed.

Likewise, our review of the record in the instant cause reveals no evidence to indicate that respondent's living arrangement with Weston has adversely affected the children. Accordingly, we find that there is insufficient evidence that a change in custody would be in the best interest of the children.

The appellant contends that respondent's conduct has amounted to "open and notorious fornication" and as such, should, in and of itself, constitute unfitness. We do not agree. There is no indication in the record that respondent was displaying her relationship with Weston to the embarrassment or detriment of the children. Neither Weston nor respondent was married. There was no scandalous effect of their behavior either on their children or the public nor any affront to the marital institution shown of record. Mr. Burris' argument relies heavily on three child custody cases. *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 367 N.E.2d 508, is distinguishable from the instant case in that the custodial mother's involvement with her boyfriend resulted in the neglect of her children. Although the other two cases, *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302, 216 N.E.2d 229, and *Wolfrum v. Wolfrum* (1955), 5 Ill. App. 2d 471, 126 N.E.2d 34, are not so clearly distinguishable, in all three cases the wife was living in an adulterous relationship with a married man. *Hahn* and *Wolfrum* were decided prior to the enactment of the new Marriage and Dissolution of Marriage Act which specifically mandates that "[t]he court shall not consider conduct of a present or proposed custodian that does not affect his relationship to the child." (Ill. Rev. Stat. 1977, ch. 40, par. 602(b).) Thus, allegedly immoral conduct, in and of itself, without a showing of detriment to the children, is insufficient proof of unfitness.

Likewise, we agree that it was not palpably erroneous for the court to have determined that a change in custody to Mr. Burris would not have served the welfare of the Burris children. The evidence showed that Mr. Burris now resides in a three-bedroom home with his new wife and their four children, that he has become disabled and has lost income. An award of custody to him would have resulted in a family of eight residing in a three-bedroom home, on approximately $550 income per month.

The First and Third Districts have recently confronted appeals involving similar fact patterns, namely, divorced fathers seeking custody in circumstances where custodial mothers were living with their lovers, as husband and wife, but unmarried. This decision is consistent with those courts' decisions. *Jarrett v. Jarrett* (1978), 64 Ill. App. 3d 932, 382 N.E.2d 12; *Rippon v. Rippon* (1978), 64 Ill. App. 3d 465, 381 N.E.2d 70.) In the *Jarrett* opinion the court pointed out that:

"There was neither a specific finding of Jacqueline's unfitness nor

evidence which would support that conclusion. Similarly we see no evidence to warrant the conclusion that a change of custody was necessary to serve the best interests of the children. *We do find it to be an abuse of discretion for the trial court to impose its own standard in this regard and infer, without any evidence in the record, that Jacqueline's conduct in living with a man to whom she was not married was detrimental to the welfare of the children and in and of itself sufficient to disqualify her as the custodian of the children.*" (Emphasis added.) 64 Ill. App. 3d 932, 937.

The trial judge in the instant case recognized that it would be error to allow his own personal code of morality to enter into the custody decision. Although our decision should not be read to mean that we condone respondent's moral choice, we recognize that it would be equally erroneous for us to rely on our standards of morality in making this review.

■■ We also note, as did the court in *Hewitt v. Hewitt* (4th Dist. 1978), 62 Ill. App. 3d 861, 380 N.E.2d 454, the increasing frequency of unmarried couples living together. Reasons for such living arrangements include economic forces as well as personal reasons. It is not to advocate such relationships to recognize, as the court said in *Hewitt*, that "the courts should be prepared to deal realistically and fairly with the problems which exist in the life of the day." 62 Ill. App. 3d 861, 869, 380 N.E.2d 454, 460.

■■ Accordingly, in the absence of evidence in the record that the living arrangement of the children with respondent and Mr. Weston has been detrimental to them and that a change of custody to Mr. Burris would serve their welfare, we affirm the trial court's decision to deny the petition for modification.

Affirmed.

G. MORAN, P. J., concurs.

Mr. JUSTICE JONES, dissenting:
I respectfully dissent.

Mrs. Burris candidly admitted at the hearing on the petition that she was living with Weston *as husband and wife*, without the benefit of marriage, and that she *intended to continue to do so* and to keep her children with her while in pursuance of the illicit relationship.

The following effects of Mrs. Burris' conduct are noted:
(1) She has committed and is continuing to commit the crime of fornication, contrary to section 11—8(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 11—8(a)). (See *DePhillips v.*

*DePhillips* (1965), 63 Ill. App. 2d 19, 211 N.E.2d 147; *People v. Potter* (1943), 319 Ill. App. 409, 49 N.E.2d 307.

(2) Pursuant to section 1(D)(j) of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(j)), Mrs. Burris would be conclusively deemed unfit to have a child. That section provides:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:
>
> * * *
>
> (j) Open and notorious adultery or fornication."

Subsection (D)(i) of the same section of the Adoption Act includes "depravity" in the definition of an unfit person. There is sound precedent that would bring Mrs. Burris within that category of persons. (See *Tiernan v. Stewart* (1975), 33 Ill. App. 3d 545, 338 N.E.2d 153; *Taylor v. Starkey* (1974), 20 Ill. App. 3d 630, 314 N.E.2d 620.)

(3) Unquestionably, the "home" maintained by Mrs. Burris and Weston could not be licensed as a foster home, or they as foster parents, pursuant to the Child Care Act of 1969 (Ill. Rev. Stat. 1977, ch. 23, par. 2211 *et seq.*) because of the standards for child care imposed by that statute and the Illinois Department of Children and Family Services. (See Department of Children and Family Services Regulation No. 5.12, revised January 1, 1970, Minimum Standards for Licensed Foster Family Homes.)

(4) But for the truth of the matter alleged, Mrs. Burris would have an action for slander or libel against any person who uttered or published any declaration to the effect that she was living as man and wife with Weston. Section 1 of "An Act to revise the law in relation to slander and libel" (Ill. Rev. Stat. 1977, ch. 126, par. 1) provides:

> "That if any person shall falsely use, utter or publish words, which in their common acceptance, shall amount to charge any person with having been guilty of fornication or adultery, such words so spoken shall be deemed actionable, and he shall be deemed guilty of slander."

(5) The children, while living with Mrs. Burris, could be found to be neglected children within the purview of section 2—4(1)(b) of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 702—4(1)(b)), which provides:

> "(1) Those who are neglected include any minor under 18 years of age
>
> * * *
>
> (b) whose environment is injurious to his welfare * * *."

Consideration of section 2—4(1)(b) should be coupled with the purpose and policy of the Juvenile Court Act as declared by the legislature in section 1—2(1) of the Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—2(1)), which states, in part:

"The purpose of this Act is to secure for each minor subject hereto such care and guidance, preferably in his own home, as will serve the moral, emotional, mental, and physical welfare of the minor and the best interests of the community; * * *."

In the aggregate the above statutes and policies constitute a sharp sociological statement and condemnation by the People of the State of Illinois regarding the living arrangement selected by Mrs. Burris for her children and now sanctioned by the majority. They justify, even require, a determination that Mrs. Burris is an unfit mother. In view of such social policy the majority opinion must be considered debasing to the notion that our laws should have a civilizing influence on society.

The majority opinion leaves us without a standard whereby the conduct of parents in their relations with their children may be tested for its adherence to an acceptable community norm. Substituted instead is a completely subjective test based upon the wishes, whims or inclination of the custodial parent.

Conduct of Mrs. Burris, which, in any community, would be immoral and criminal is acceptable to the majority because there is no "proof" that it is detrimental to the children or is other than in their best interest. As used by the majority in this case the terms "detrimental to the children" and "in the best interest of the children" are meaningless generalities. It is obvious that no real evidence was offered on the question, and, in truth, in the absence of some demonstrable physical injury or impairment, the production of real evidence would be difficult. Is there, or can there be, nonphysical injury or detriment to minor children who are compelled to live with a parent who is by her very lifestyle committing a crime and living daily in an amoral situation? The sociological experience of the State of Illinois furnishes a decidedly affirmative answer which is reflected by the statutes and social policies listed above. It is implicit in Mrs. Burris' brief and the majority opinion, and expressed by many others, that we are living by a "new morality" in which illicit relationships are an accepted norm. But the "new morality" is in fact a very old morality, tried and rejected numerous times by many societies, including the one in which we live.

This is not the place, nor is it within my ability, to make a analysis regarding the harm inflicted upon society in general and the affected children in particular by sanctioning the upbringing of children in the circumstances shown in this case. But pertinent here are the remarks of

the court in *Gehn v. Gehn* (1977), 51 Ill. App. 3d 946, 949, 367 N.E.2d 508, 511:

> "The record in this case supports a finding that the plaintiff had no qualms in exposing and exhibiting to her children her illicit relationship with her boyfriend. The plaintiff admits her immoral conduct, but argues that no testimony was presented which would show that her conduct had any ill effects upon the children. It might be not only difficult but impossible to present evidence showing objective effects that such conduct would have on minor children. The effects may well be subjective ones that will raise their ugly heads and make their presence known at some future time. Certainly the conduct of the plaintiff cannot be regarded as good and wholesome moral training. We further note that the plaintiff utterly failed to display any degree of penitence as far as her conduct was concerned, but on the contrary assured the court that if she continued to have custody of the children she would persist in the overnight sojourns to her boyfriend's house with her five children."

Mr. Burris testified that the children were "troubled" by the living arrangement of the mother and that, in his opinion, this trouble was reflected in the children's feelings of having no roots, Tracy's allergy condition and Alex's nervous behavior and poor school work. The majority state that there is no "evidence" that any of these difficulties had been brought about by the children's living with their mother and her paramour. When the father testified to the difficulties, as he was qualified to do, that was "evidence." The majority probably meant to say that the father's uncorroborated testimony did not constitute "proof" of the difficulties having resulted from the living arrangement of their mother. It is submitted that there probably could never be proof to an extent where all other possibilities would be foreclosed. There can only be opinions expressed from which triers of fact can reach conclusions. A concerned father is certainly in a position to express an opinion and it should be entitled to great weight. Especially where there is no "evidence" to show the negative of the proposition.

Precedent for a finding that Mrs. Burris' present and ongoing illicit relationship renders her unfit is found in *DeFranco v. DeFranco* (1978), 67 Ill. App. 3d 760; *Gehn v. Gehn*; *Hahn v. Hahn* (1966), 69 Ill. App. 2d 302, 216 N.E.2d 229; *Kline v. Kline* (1965), 57 Ill. App. 2d 244, 205 N.E.2d 775; *Wolfrum v. Wolfrum* (1955), 5 Ill. App. 2d 471, 126 N.E.2d 34, none of which are distinguishable on the pertinent facts from this case.

The cases relied upon by the majority, with two exceptions to be noted, are instances where *past* misconduct was found to not constitute *present* unfitness. The conclusion reached in those cases is a reasonable

one. If a contrary conclusion had been reached, then a large percentage of present day parents would be termed unfit. The law and our society makes a sharp and fully warranted distinction between past misconduct forgiven and defiant present misconduct.

The two cases the majority cite which support their position are *Christiansen v. Christiansen* (1975), 31 Ill. App. 3d 1041, 335 N.E.2d 581, and *Jarrett v. Jarrett* (1978), 64 Ill. App. 3d 932. However, in reaching its conclusion, the court in the *Jarrett* case cites *Nye v. Nye* (1952), 411 Ill. 408, 105 N.E.2d 300; *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 365 N.E.2d 647; *Hendrickson v. Hendrickson* (1977), 49 Ill. App. 3d 160, 364 N.E.2d 566; *Christiansen v. Christiansen; Van Buskirk v. Van Buskirk* (1974), 19 Ill. App. 3d 647, 312 N.E.2d 395; *Collings v. Collings* (1970), 120 Ill. App. 2d 125, 256 N.E.2d 108; *Arden v. Arden* (1960), 25 Ill. App. 2d 181, 166 N.E.2d 111; *Brown v. Brown* (1957), 13 Ill. App. 2d 56, 140 N.E.2d 528. In every one of these cases, except *Christiansen v. Christiansen*, the improprieties related to *past* conduct which had been terminated at the time of trial and the cases do not support their conclusion.

In the recent case of *Rippon v. Rippon* (1978), 64 Ill. App. 3d 465, 468, relied upon by the majority, the court recited the rule I note above:

"Only when an open adulterous relationship exists with no possibility of marriage, as when the paramour is and remains married to another woman, is there sufficient grounds to remove custody from the mother. (See *Hahn v. Hahn* (2nd Dist. 1966), 69 Ill. App. 2d 302, 216 N.E.2d 229.) The underlying rationale is that the past misconduct does not indicate the probability of future misconduct once the mother has again married."

Accordingly, the *Rippon* case is authority that contradicts the result reached by the majority.

For the foregoing reasons I would find Mrs. Burris unfit to have custody of the children and reverse the trial court.