In *re* MARRIAGE OF PATRICIA A. KENNEDY, Petitioner-Appellant, and ROBERT J. KENNEDY, Respondent-Appellee.

First District (3rd Division) Nos. 79-494, 79-994 cons.

Opinion filed March 18, 1981.

538

Jerome Marvin Kaplan, of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Ronald S. Ladden and Beermann, Swerdlove, Woloshin & Barezky, of Chicago (Miles N. Beermann, of counsel), for appellee Robert J. Kennedy.

Laser, Schostok, Kolman & Frank, of Chicago (Marc H. Schwartz, of counsel), for appellee Milton J. Kolman.

Mr. PRESIDING JUSTICE RIZZI delivered the opinion of the court:

A judgment dissolving the marriage of petitioner, Patricia A. Kennedy, and respondent, Robert J. Kennedy, was obtained on Patricia's petition in 1978, on the grounds of mental cruelty. An order apportioning the property, determining custody of the children and granting attorney's fees was entered in early 1979. Patricia appeals the second half of the bifurcated judgment. We affirm in part, modify and reverse in part and remand.

Robert and Patricia were married in 1972. At that time, Robert owned four music stores, which retailed records and tapes. Though Robert's mother and father were employed in the operation, Robert was the chief stockholder and president with control over the business.

At first, the couple lived in Patricia's home in Glen Ellyn. Shortly after moving in, Robert learned that the mortgage payments on the house were 6 months in arrears, and he brought the payments up to date with his own savings. Shortly afterward, the couple sold the house and moved to Peoria, buying a new home there with the proceeds from the sale of the Glen Ellyn house along with a $10,000 loan from Patricia's mother, Mrs. Marguerite McNamara.

In July of 1973, Erin and Laurie, twin daughters, were born. Patricia's mother moved in to help her daughter with the housework. She resided with the couple for the rest of the marriage. In August of 1973, the family sold the Peoria house and bought a house in Naperville. Patricia's younger brother, Bryan, also moved into the house.

The live-in relatives apparently caused friction in the marriage.

Patricia's mother expressed a belief in the supernatural, complaining that the Naperville house was haunted. According to Robert, Patricia at first went along with her mother's belief, perhaps in an effort to humor her. Later, however, Patricia also manifested a belief in a world of ghosts and the supernatural. The beliefs were carried over to the twins. While on vacation in Jamaica in 1974, Patricia and her mother refused to eat food prepared by the staff at a rented villa, claiming that it was poisoned. Both claimed to hear drums which were inaudible to Robert or other houseguests. During a local fishing festival, guitars and drums were played on a beach adjoining the villa. Patricia and her mother barricaded themselves and the twins in the villa in fear of a native uprising. Despite explanations of the festival by Robert and the houseguests, attempts to calm them were unsuccessful. One houseguest later learned from one of the twins that Patricia's mother kept voodoo dolls named for the houseguests, for Robert and Robert's parents. According to the child, Mrs. McNamara stuck pins in the dolls.

At first, Robert accepted the supernatural beliefs as a joke. He suggested that the strange bangings and muffled footsteps in the Naperville house that Patricia thought came from a ghost were in fact caused by her brother entertaining his girlfriend in the evening. Patricia, the brother and the girlfriend each denied it. Patricia instead pleaded that the Naperville house be sold, saying that her neighbors had been staring in the windows and acting strangely.

Robert refused to move, explaining that he did not have enough money to buy a new home. His business was expanding, and he needed capital to satisfy commitments to open new stores. He complained to Patricia that her brother was freeloading. She testified that her brother contributed to the upkeep of the household by taking the twins to a fast-food chain about once a week. Mrs. McNamara contributed to the household by caring for the children, purchasing the groceries and helping with the housework. Robert testified that he wanted Patricia's mother to move out, fearing that she was a bad influence on the children. He said that at one point Patricia agreed. Mrs. McNamara then insisted that she and Patricia's brother would not move out until Patricia and Robert signed a promissory note for the $10,000 loan. The note was signed on October 1, 1975. However, since none of Mrs. McNamara's other children would allow her to live with them, and since Patricia refused to put her mother in a nursing home, Mrs. McNamara stayed in the house.

In 1975, Robert needed financing to open a new store. The bank required Patricia's personal guaranty on the loan, but she refused to provide it unless her husband agreed to move to a new and larger home. He agreed. She signed the guaranty, and on June 1, 1975, they purchased a

home in Inverness, using the proceeds from the sale of their Naperville house.

In September of 1976, Robert's business became overextended. He feared the bank would call in his loans. The entire business was threatened. Robert began to drink to excess, becoming intoxicated nightly. After 2 weeks, he stopped drinking and convinced the bank to refinance the business after a change in business strategy. The stores soon returned to profitability.

The twins were hyperactive children who, according to Patricia, needed close supervision. Their teacher at a Montessori school testified that they had some difficulties and were more aggressive than other children, but progressed when given close attention. With poor muscle control and visual discrimination problems, the twins were slightly immature for their age. Both parents participated in conferences at the school. Patricia explained that some of the twins' difficulties might be caused by their premature birth.

Witnesses for each party testified that the twins received affection from their parents. They appeared to be slightly closer to their mother, who, until the separation, stayed at home with them all day. Patricia kept a neat home, and the twins were always appropriately attired.

In 1977, after experiencing marital problems, the couple consulted a marriage counselor and a priest, but their difficulties continued. Patricia complained that Robert's parents were running their lives. His parents were allowed to visit only on the children's birthday and on Christmas. Robert discharged his mother from the business at Patricia's insistence. Robert complained that Patricia was mixing barbiturates and alcohol, while she complained that he was drinking daily. Witnesses testified that on occasion both Robert and Mrs. McNamara had allowed the twins to sip their drinks.

In April of 1977, the Kennedys bought a half interest in a vacation house in Lake Geneva, Wisconsin. After one visit to the house, Patricia refused to return. Her mother claimed that poltergeists, ghosts who manifest themselves by rapping noises, lived on the second floor. Patricia forced Robert to agree never to allow the twins to spend a night in the house. Instead, she required that they spend the night in a hotel while visting Lake Geneva on vacation.

On November 8, 1977, without warning to Robert, Patricia and her mother moved the twins and all the furniture out of the Inverness home. Robert was left with a single bed. He admitted to drinking to excess that evening.

Patricia bought a home in Palatine. The girls lived with her until the determination of permanent custody in favor of Robert in 1979. Although

Mrs. McNamara initially lived with Patricia and the children, her deteriorating health eventually forced her to leave on August 2, 1978. Patricia obtained a job selling cosmetics and was working 20 hours a week at the time of the hearing. On working days, the teenage daughters of a neighbor looked after the children after school until Patricia returned home.

Robert bought a home in Rolling Meadows. In anticipation of obtaining custody, he talked with three potential housekeepers who would work full time to care for the twins while he was at work.

Robert claimed that after suit for custody was joined, Patricia wrote anonymous letters to shopping centers in which his music stores were located. The stores paid percentage rentals, and the letters suggested that Robert was concealing sales from the landlords. A similar letter to the Internal Revenue Service suggested an audit. Patricia denied writing the letters. Audits revealed that there had not been any concealed sales.

When the petition for dissolution was filed, the children remained in the custody of their mother. Robert was ordered to pay $150 per week in support. The twins were enrolled in public school, where they were diagnosed as having learning disabilities. They were given special education and special tutoring.

Patricia claimed that incidents during Robert's periods of visitation demonstrated his unworthiness as permanent custodian. She claimed that in April of 1978, he was intoxicated when he returned the twins. He denied being intoxicated. In July of 1978, Erin was upset while with her father on vacation and demanded to return home. He brought her home, and Patricia claimed that the daughter then calmed down. Robert acknowledged that he took the child home, but said that Erin had wanted to rejoin her friends in the neighborhood. The next day Erin returned to vacation with her father. In December 1978, Laurie returned from visitation with a burn on her back. Patricia claimed it was caused by a cigarette; Robert denied it. In January 1979, Erin returned from visitation with a black eye.

After the separation, the house in Inverness was sold for $260,000. The net proceeds, which totalled $111,173.62, were placed in an escrow account. The balance of the account after court-authorized withdrawals was $51,918.87.

When the case went to trial, the court appointed an attorney to represent the interests of the children, as authorized by section 506 of the Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 506).

Three experts testified on the custody issue. Patricia's treating psychiatrist said that he treated her for an "adjustment reaction to adult life." The treatments had been helpful to her. He also treated the twins,

who had learning disabilities and were experiencing an adjustment reaction to the dissolution of the marriage and custody fight. He considered Patricia to be a fit and proper parent and said that the interests of the twins would be well served by affording custody to the mother. He did not examine Robert.

A court-appointed psychologist examined both the parties and the twins. He concluded that both parents were "less than optimal." Patricia had chronic anxiety reactions with basic concerns about adequacy, competence and worth; Robert had an anxiety reaction with basic difficulties in masculine identification. The twins each had generally negative feelings toward men caused by their relationship with their mother and maternal grandmother. They quoted their mother and Mrs. McNamara in demeaning their father. Both felt pressured to look with disdain upon Robert. Even taking into account the age of the twins and the personal love and affection that a mother can give to young daughters, the witness concluded that it would be in the best interests of the children that their father be given custody.

The court also appointed a psychiatrist to review its psychologist's findings and examine both parents. The psychiatrist found that Patricia could be an appropriate parent, but because of a tendency to deny and minimalize, he found her to be fit only with qualifications. He did not feel she would be an ideal parent. He said that Robert was well-integrated and had successfully corrected earlier problems in his business. He was fit without qualifications as a parent. After duly considering the children's tender ages, he felt that it would be best to grant custody to the father.

The attorney appointed to represent the children recommended by way of argument in the judge's chambers that custody be given to Robert. This recommendation was later given again in court for the record, though the attorneys for both parties were absent.

Without claiming that she was denied a fair trial, Patricia has invited this court's special attention to the manner in which the trial court conducted the hearing. After carefully examining the record of the proceeding, we conclude that the trial judge did not conduct the trial in "unseemly haste," and that there is no indication that he was predisposed to rule in Robert's favor. The trial judge made a special effort to accommodate the parties' attorneys, insisting only upon trying the case according to the rules of law.

CUSTODY

The custody of the twin daughters was awarded to Robert. Patricia moved to stay the transfer of custody, but the stay was denied. The twins have now lived with their father since March 19, 1979.

■■ Patricia first contends that the order granting custody to Robert is

deficient because the trial judge did not make specific findings of fact under section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 602). The Act provides:

"(a) The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school and community; and

(5) the mental and physical health of all individuals involved."

The authorities are split on the question, but the better view is that specific findings of fact are not required under section 602. (*In re Marriage of Auer* (1980), 86 Ill. App. 3d 84, 87, 407 N.E.2d 1034, 1036; *In re Marriage of Ramer* (1980), 84 Ill. App. 3d 213, 218, 405 N.E.2d 401, 404; *In re Custody of Melear* (1979), 76 Ill. App. 3d 706, 708, 395 N.E.2d 208, 210. Contra, *Wurm v. Wurm* (1979), 68 Ill. App. 3d 168, 170-71, 385 N.E.2d 894, 896.) The initial award of permanent custody must be distinguished from a later modification of custody under section 610. The latter requires findings of fact upon the record (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 420-21, 396 N.E.2d 499, 501-02), but that is because the statute only allows modification for three specified reasons. (Ill. Rev. Stat. 1977, ch. 40, par. 610(b).) Specific findings of fact by the trial court are needed to insure that the modification rests on a proper basis. Initial custody awards, on the other hand, are made after an exercise of the trial judge's broad discretion, taking into account "*all* relevant factors." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 40, par. 602(a).) The statute lists five such factors, but it does not require specific determinations regarding each of them. All that is necessary is that the record demonstrate that the trial judge considered all relevant factors, including those that the statute mentions. (*Melear*, 76 Ill. App. 3d 706, 708-09, 395 N.E.2d 208, 210.) Although the trial judge did not make specific findings of fact here, the record indicates that the relevant factors received ample consideration.

■■ Patricia suggests that what in fact happened here was a modification, not an initial award of custody, so that specific findings of fact were required. But a permanent award is not a modification merely because the permanent custodian differs from the temporary custodian. To equate

permanent awards with modifications would put all the decision-making strain on the temporary custody order, since the permanent award at the conclusion of the litigation could only change custody under the stringent standards of section 610. Such importance would make the temporary order much-litigated and time-consuming. A "pre-temporary" award of custody would then have to be made to provide for the child while the temporary order was pending. The result would be to shift the emphasis still further back. Such an absurd result is neither desirable nor required. An order for temporary custody gives the court time to determine the best interest of the child more accurately than was possible in the rush of the temporary order. It prepares the way for the permanent award; it does not preempt the final decision. The permanent award must be made under the best interest standard of section 602, not section 610.

Procedural matters aside, a review of the trial court's decision regarding custody of the twins indicates that it was proper. The determination as to which of the parties to a failed marriage will have custody of the children is one of the most difficult tasks of the trial courts. (*King v. Vancil* (1975), 34 Ill. App. 3d 831, 834, 341 N.E.2d 65, 68.) The appellate court will not interfere with the proper exercise of a trial court's discretion. (See *Miezio v. Miezio* (1955), 6 Ill. 2d 469, 472-73, 129 N.E.2d 20, 22.) The custodial decision rests on temperaments, personalities and capabilities, and the trial judge is in the best position to evaluate these factors. (*Marcus v. Marcus* (1974), 24 Ill. App. 3d 401, 407, 320 N.E.2d 581, 585.) Only where the award is contrary to the manifest weight of the evidence will it be reversed. *Soldner v. Soldner* (1979), 69 Ill. App. 3d 97, 103, 386 N.E.2d 1153, 1158.

Patricia urges the continued vitality of the "tender years doctrine." Once a well-recognized facet of Illinois divorce law, the doctrine created a presumption or preference for custody in the mother. When all other factors were equal, the mother received the child.(*Huey v. Huey* (1975), 25 Ill. App. 3d 20, 21, 322 N.E.2d 560, 561; *Melear*, 76 Ill. App. 3d 706, 709, 395 N.E.2d 208, 210.) Or, the father could obtain custody only where there was compelling evidence that the child's best interest would be served by denying the mother custody. (*Breedlove v. Breedlove* (1972), 5 Ill. App. 3d 774, 776, 283 N.E.2d 919, 921.) But changing social and legal trends have cast the tender years doctrine aside. (*Pratt v. Pratt* (1975), 29 Ill. App. 3d 214; 216, 330 N.E.2d 244, 246.) The doctrine rested on a sociological presumption (*Strouse v. Strouse* (1966), 75 Ill. App. 2d 362, 364-65, 220 N.E.2d 485, 486) that maternal affection is more active and better adapted to the care of the child than that of the father. (*Nye v. Nye* (1952), 411 Ill. 408, 414, 105 N.E.2d 300, 303.) With the advent of new lifestyles for both men and women, however, the factual basis for the

doctrine, if there ever was one, has vanished. (*People ex rel. Irby v. Dubois* (1976), 41 Ill. App. 3d 609, 613, 354 N.E.2d 562, 566; see also *Jines v. Jines* (1978), 63 Ill. App. 3d 564, 569, 380 N.E.2d 440, 443.) In addition, we note that article I, section 18 of the 1970 constitution provides, "The equal protection of the laws shall not be denied or abridged on account of sex \* \* \*." As a result, today there is no rule requiring that a fit mother be given custody of her child of tender years. (*In re Marriage of Sieck* (1979), 78 Ill. App. 3d 204, 215, 396 N.E.2d 1214, 1222; *Irby*, 41 Ill. App. 3d 609, 612, 354 N.E.2d 562, 565; *King*, 34 Ill. App. 3d 831, 836, 341 N.E.2d 65, 69; *Pratt*, 29 Ill. App. 3d 214, 216, 330 N.E.2d 244, 246; *Anagnostopoulos v. Anagnostopoulos* (1974), 22 Ill. App. 3d 479, 482, 317 N.E.2d 681, 683.) The sex of the candidate for custody is but one of many factors that may be considered in determining which parent receives the child. *Mulvihill v. Mulvihill* (1974), 20 Ill. App. 3d 440, 444, 314 N.E.2d 342, 345.

■■ The guiding principle of the trial judge's decision is the best interest of the child. (*Miezio*, 6 Ill. 2d 469, 472, 129 N.E.2d 20, 22; *Nye*, 411 Ill. 408, 415, 105 N.E.2d 300, 304; *Eaton v. Eaton* (1977), 50 Ill. App. 3d 306, 309, 365 N.E.2d 647, 650; Ill. Rev. Stat. 1977, ch. 40, par. 602(a).) Patricia contends that the evidence shows that she would make a better parent for the twins. She points out that from the time of birth until the change of custody, the twins lived with her, and she attended to their personal daily needs. But Patricia testified that she, like her husband, would be working and would have to hire someone to look after the girls while she was away. Since she will not remain full time in the home, no natural equity exists in her favor. (*Jines*, 63 Ill. App. 3d 564, 569, 380 N.E.2d 440, 443.) Patricia also suggests that because of her sex she will be better able to counsel the girls. This factor was expressly presented to the court's witnesses who examined the parties and recommended that the father be given custody. The trial judge clearly considered this issue and made liberal provisions for visitation. There is no reason to alter his determination.

■■ It should be noted that Patricia has responded favorably to treatment for her psychological problems. Such treatment and favorable response can completely nullify the ill effects of emotional problems that plague a parent during the marriage. (*Eaton*, 50 Ill. App. 3d 306, 311, 365 N.E.2d 647, 651.) However, merely overcoming handicaps does not mean a parent must receive custody. The trial judge must make the award after determining which parent will serve the best interests of the children. The trial judge here was well advised of the circumstances of Robert and Patricia both from personal friends of the parties and from experts who rendered impersonal opinions. He made an award which was not against the manifest weight of the evidence and which will not be overturned.

PROPERTY

The trial court awarded the entire music store business to Robert. The balance of the escrow bank account, after certain court-approved withdrawals by the parties, was divided, with Patricia getting about $37,000 and Robert about $14,000. The judge did not explain what property he regarded as marital or nonmarital. The parties agree that the escrow account is marital property. The dispute over the disposition of the parties' property centers on Robert's music stores.

Title to the stores is in several corporations in which Robert holds most of the stock. However, for the purpose of valuing the marital property, and, of course, without appropriating the corporate property itself to the injury of other shareholders, we think it proper to look past the corporate form and regard Robert as a substantial owner of the music stores themselves.

The stores that Robert owned before the marriage are his nonmarital property. They are no doubt worth more now than they were then. However, the increase in value of nonmarital property is nonmarital property. *In re Marriage of Komnick* (1981), 84 Ill. 2d 89, 95, 417 N.E.2d 1305, 1308.

■■ It appears that some of the increase in value is due to improvements made with marital resources, namely the business' earnings, Robert's personal efforts and investments, and small family loans. The classification as marital or nonmarital of property which was originally nonmarital but which has been improved with marital resources is a difficult and much-discussed subject. (See *In re Marriage of Crouch* (1980), 88 Ill. App. 3d 426, 410 N.E.2d 580; *In re Marriage of Lee* (1980), 88 Ill. App. 3d 1044, 410 N.E.2d 1183.) Section 503 of the Act mentions "the contribution * * * of each party in the * * * appreciation in value * * * of the marital *and non-marital* property" as one of the factors to consider in dividing the marital property. (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 40, par. 503(c)(1).) This language indicates that under the circumstances of a particular case, it is possible for one spouse to improve the other spouse's nonmarital property without making that property marital.

The improvements here were not substantial. If so routine a practice as the use of retained earnings of a business for normal growth were to make the business marital, no business would remain nonmarital for long. Robert has already drawn an apparently adequate salary for his own efforts in the business. The loan from Mrs. McNamara was small, seems to have had strings attached, and has been repaid. In none of this do we see any intent on anyone's part to treat the stores as a marital asset. Whatever might be the result in other circumstances, such as more dramatic or separable improvements to the property, or a more cooperative family

effort at making improvements, we think that the stores owned by Robert prior to the marriage remain nonmarital despite their absorption of some marital resources.

■■ The stores acquired after the marriage are new and distinguishable property; we do not regard them as mere "improvements" to the old stores (or the corporations or "the business"). The new property is marital. It does not come under any exception to the rule that property acquired during the marriage is marital. The new stores were bought, it is true, largely with money borrowed primarily on the credit of the business; Robert suggests that money borrowed on the credit of nonmarital property is nonmarital. But the collateral seems to have included the new stores, and the lender insisted on personal guarantees not only from Robert but also from Patricia. The money was raised substantially on marital credit, and the property bought with it is marital property.

■■ Patricia's contention that Robert has "commingled" the new stores with the old and that all the stores have thereby become marital property is unpersuasive. The stores are sufficiently separable so that there is no practical necessity to treat them as a unit. More importantly, the fact that Robert put the new stores into the old corporations does not evince an intent to donate the old stores to the marriage. Compare *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517, where the parties treated a joint bank account as a marital asset.

Although some of Robert's shares, representing his interest in the new stores, are marital property, it was proper to award all the stock to Robert so as to avoid future friction over the conduct of the business. The issue is whether the property awarded to Patricia represents a "just proportion" of the value of the marital estate, including the new stores.

■■ It is difficult to put a value on the marital property, as the value of the stores is bitterly disputed. There are even complications in determining how much cash each party was awarded from the escrow bank account, the main liquid marital asset. The parties were allowed to withdraw money during the suit to pay taxes due, but the tax bills were later revised, and adjustments had to be made. It is not clear whether the taxes were attributable to the marital or nonmarital estates. The trial court made no express findings on these points. Nor does the record demonstrate which properties were considered marital or nonmarital by the trial court. Under the circumstances, the division of property is not supported by the record. We conclude that the case should be remanded for a new hearing as to the distribution of property.

### CHILDREN'S ATTORNEY'S FEES

The trial court awarded $3,575 to the attorney appointed to represent

the interests of the children and ordered Patricia to pay $3,000 of that amount.

■■ Although section 506 provides simply for "an order * * * in favor of the child's attorney * * * against either or both parents * * *," we believe that in apportioning the obligation between the parents, the court must consider their financial resources. (*Cf.* Ill. Rev. Stat. 1977, ch. 40, par. 508 (parties' attorney's fees).) In view of Robert's much greater ability to pay, we think it was an abuse of discretion to make Patricia pay most of the attorney's fees. In fact, only a few weeks before the final judgment, the trial court itself had ordered that Robert was to pay the fees. Neither the financial status of the parties nor any other material fact had changed in the interim; Patricia's attempts to stay the change of custody do not justify the attorney's fees order. Accordingly, we modify the order. Robert is to pay all the fees of the children's attorney. However, we believe that the $3,575 fee was excessive under the circumstances of this case, and it is therefore reduced to $3,000.

Accordingly, the portion of the March 19, 1979, order of the trial court awarding custody of Laurie and Erin Kennedy to Robert Kennedy is affirmed. The portion of the trial court order of March 19, 1979, relating to the division of property is reversed, and the case is remanded for further proceedings. The order entered April 10, 1979, awarding fees to the attorney for the children is modified by reducing the fee to $3,000 and requiring Robert Kennedy to pay the entire amount.

Affirmed in part, modified and reversed in part and remanded.

McNAMARA and SIMON*, JJ., concur.

---

* MR. JUSTICE SIMON participated in oral argument and the decision in this case before becoming a member of the Illinois Supreme Court.