*In re* MARRIAGE OF SORAPARU (Laura D. Soraparu, Petitioner-Appellee, v. James J. Soraparu, Respondent-Appellant).

First District (1st Division)   No. 85—0806

Opinion filed September 15, 1986.—Rehearing denied October 9, 1986.

BUCKLEY, J., specially concurring.

Jacobs & Jacobs, of Chicago, for appellant.

Richard Karr and Irving Faber, both of Irving Faber & Associates, Ltd., of Chicago, for appellee.

PRESIDING JUSTICE QUINLAN delivered the opinion of the court:

Respondent, James Soraparu, appeals from an order of the circuit court of Cook County granting custody of his son, Joseph Soraparu, to his wife, Laura. Respondent also appeals the trial court's order directing him to pay a $500 fee to the guardian *ad litem*, and its order finding him $300 in arrears in child support.

Laura and James were married in Chicago on January 5, 1979. One child, Joseph, was born to the marriage on February 9, 1980. On March 19, 1982, Laura Soraparu petitioned the circuit court to dissolve her marriage to James, alleging that he was guilty of mental cruelty, and requested various forms of relief including custody of their son, Joseph. James answered and counterpetitioned, denying the allegations of mental cruelty. He also challenged Laura's request to receive temporary custody of Joseph.

On March 29, 1982, at Laura's request, the court entered a restraining order and a permanent injunction against James enjoining him from physically harming or harassing either Laura or Joseph. The court also awarded temporary custody of Joseph to Laura at that time.

On April 20, 1982, the circuit court ordered James to pay Laura temporary child support in the amount of "20% net from all sources of income." In addition, the court granted visitation privileges to James.

At a hearing on October 29, 1984, the trial court found that the grounds for mental cruelty had been established against James. Also at the hearing, the trial court, on its own motion, put a ceiling on

the amount of child support James was required to pay. The court modified its previous order by requiring James to pay "$40 a week or 20% of his net salary whichever is greater." The court stated that the order was only temporary and would be reviewed at a later date. The record reveals that although James' attorney initially suggested that a hearing be held to determine James' financial ability to pay the increased amount, no formal objection to the court's order was ever made. James' attorney agreed to advise him to begin paying the increased amount. No further challenge to the court's order was made by either James or his attorney.

On January 28, 1985, the child custody hearing began and was vigorously contested. The court heard testimony from both Laura and James, as well as from Laura's father, Herbert Brown; James' fiancee, Rita Dunn; and Mario Accomando, James' co-worker. Much of the testimony was predictably contradictory.

James testified that he was 25 years old, and was employed as a real estate agent, working solely on commission. He lived in a one-bedroom condominium in a Chicago suburb. James stated that during the marriage he supported and cared for his family and that they "never went hungry or were without a roof over their heads." When the child was small, James stated that he bathed him, changed his diapers, and fed him. James further testified that he loved Joey and considered himself to be a fit and proper parent.

James expressed concern over Laura's babysitting arrangements, contending that Joey was constantly being moved around, staying either at Laura's mother's home, her brother's apartment, or with her boyfriend. He also stated that whenever he went to pick Joey up for visitation, Joey was "sick, cut, or bleeding." James testified that Laura did not dress the child properly, and recounted an incident when Laura sent Joey out in the snow wearing gym shoes. He also claimed that Laura dressed Joey in clothes that were too small and which cut off his circulation.

James also testified that he had filed two complaints with the Department of Children and Family Services regarding his concerns over Joey's welfare. He admitted that both complaints were investigated by the Department, and that the allegations were found to be without merit. James further stated that he had sent several letters to the guardian *ad litem*, complaining about the way in which Laura was taking care of Joey. The guardian *ad litem*, however, never responded to James' letter.

Laura testified that she was 25 years old and lived in an apartment in Chicago. She stated that she and Joey occupied the apart-

ment, and that Joey had his own room. Laura testified that she had been employed for the last three years as a claims adjuster, and that during her employment she received two promotions and six raises. She worked 35 hours per week from 5 p.m. until midnight. Laura told the court that she chose those hours so that she could spend more time with Joey during the day. She anticipated that she would be changing her working hours once Joey began school.

Laura further testified that since her separation from James, she had been the one to provide for most of Joey's needs. She takes Joey to the doctor at least twice a year, enrolls him in "mini camp" programs and other preschool activities at the YMCA, regularly bathes and clothes Joey, feeds him, plays with him, and takes him on vacation. Laura testified that James was very unconcerned about Joey's welfare during their marriage, and stated that he even refused to give her money to take Joey to the doctor. She also asserted that James never bathed Joey or changed his diapers and, generally speaking, gave Joey very little attention.

Laura testified that since the separation, she had noticed that Joey returned home from his visits with his father in poor physical and emotional condition, experiencing headaches, stomachaches, was "hyper" and tired. She also testified that during their marriage she was physically abused by James, and that since the separation she and the other members of her family had received harassing phone calls from James. Laura stated that James had threatened to harm both her and Joey. She also stated that she had to borrow money from her family and boyfriend in order to pay her bills. Laura testified that James was unemployed during much of their marriage. She concluded her testimony by stating that she loved Joey very much and considers herself to be a fit and proper parent.

Rita Dunn and Mario Accomando both testified on behalf of James. Rita Dunn stated that she and James planned to be married soon after the divorce was final. She supported James' testimony that when Joey is picked up for visitation he is often sick or injured. She also stated that she and James take Joey to church on Sunday, and that if custody were awarded to James, she would stay home and take care of him on a full-time basis. Rita testified that she believed that James was a fit and proper person to have custody of Joey.

Mario Accomando testified that he had been James' co-worker for the past 18 months. He stated that he had seen James and Joey together on three or four occasions and that the two seemed to have an excellent relationship. Mario attested to James' capability as

a parent and believed him to be a fit and proper person to have the care and custody of Joey.

Herbert Brown, Laura's father, testified on behalf of Laura. He described an incident that occurred in August 1983 when he and his sons discovered James in the bushes behind the house at 3 a.m. After discovering that the tires on his car had been slashed, Mr. Brown called the police and had James arrested. In response, James filed a complaint against Mr. Brown, who is a police officer, with the Office of Professional Standards for the Chicago police department. Following an investigation, the police department found that the complaint against Mr. Brown was without merit.

The guardian *ad litem* made an oral report to the court recommending that custody be awarded to Laura. He stated that he had previously considered the possibility of recommending joint custody, but in light of the intimidating letters he had received from James, he had reached the conclusion that sole custody should be awarded to Laura.

At the conclusion of the evidence, the trial court awarded sole permanent custody to Laura Soraparu. In entering judgment, the court specifically stated that custody could not be awarded to James because he was behind in his child-support payments. The court also placed great emphasis on Mr. Brown's testimony regarding the August 1983 incident when James was found "lurking" behind Mr. Brown's house at 3 a.m. The court could find no reasonable justification for James' behavior.

The trial court expressed concern over Laura's babysitting arrangements, and suggested that she find more stable accommodations for Joey. Laura agreed to comply with the court's suggestion.

The trial court also reviewed the October 29, 1984, child-support order, and reduced the minimum weekly payment to $35. Further, as stated previously, the court, in addition, entered a judgment of $300 in child-support arrearages, and ordered James to pay the guardian *ad litem* $500.

On appeal, James Soraparu contends that: (1) the trial court's order awarding permanent custody of the minor child, Joey, to Laura was against the manifest weight of the evidence; (2) the trial court's October 29, 1984, order requiring him to pay "$40 a week or 20% of his net salary whichever is greater" was an abuse of discretion in light of the fact that no evidence was offered regarding James' ability to pay the increased amount; and (3) the trial court's order requiring James to pay $500 to the guardian *ad litem* was an abuse of discretion.

■ Turning first to Mr. Soraparu's contention that the trial court's custody award was an abuse of discretion, we note that the paramount consideration before the trial court in awarding custody is the best interest of the child. (*In re Marriage of Kennedy* (1981), 94 Ill. App. 3d 537, 418 N.E.2d 947.) It is well recognized that the determination as to which of the parties of a divorce is to be awarded custody of a child is one of the most difficult decisions facing the trial court. (*King v. Vancil* (1975), 34 Ill. App. 3d 831, 834, 341 N.E.2d 65.) Although there exist few settled principles in relation to child-custody determinations, the one overriding presumption is that the trial court which observes the parties, hears the testimony and resolves the conflicts in testimony, is in the best position to decide the custody issue. (*In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 1039, 455 N.E.2d 887.) Furthermore, the decision regarding a custody award must properly rest on temperaments, personalities, and capabilities, and again, the trial judge is clearly in the best position to evaluate these factors. (*In re Marriage of Kennedy* (1981), 94 Ill. App. 3d 537, 545, 418 N.E.2d 947.) Thus, only where a custody award is contrary to the manifest weight of the evidence will it be reversed on appeal. *In re Marriage of Slavenas* (1985), 139 Ill. App. 3d 581, 587, 487 N.E.2d 739.

■ In the instant case, there is more than sufficient evidence to support the trial court's decision awarding custody to Laura. Although James strongly disputed the adequacy of Laura's care for Joey, we find that most of the contradictory testimony was resolved in favor of Laura. While the trial court made no express finding that James was unfit, it is not necessary to find one parent unfit in order to justify an award to the other parent. (*In re Marriage of Holder* (1985), 137 Ill. App. 3d 596, 600, 484 N.E.2d 485.) Much of James' testimony revealed that he loved Joey and would have attempted to provide adequate care for him had he been awarded custody. But, the record also reveals that James exhibited violent tendencies toward Laura during their marriage, and since the parties' separation, he had threatened the safety of both Laura and Joey. Laura further testified that James had made harassing and obscene phone calls to her, often after midnight, and that, despite the fact that James had been advised that these calls were disrupting Joey's sleep, he, nevertheless, continued to make the calls.

■ We reject James' contention that the trial court erred in considering the fact that he was delinquent in his child-support payments in denying him custody. Section 602 of the Illinois Marriage and Dissolution of Marriage Act (the Marriage Act) (Ill. Rev. Stat.

1985, ch. 40, par. 602) requires that the court consider all relevant evidence in determining the best interest of the child. Clearly, James' failure to pay child support is both a relevant and proper factor in determining the best interest of the child. See *In re Custody of Harne* (1979), 77 Ill. 2d 414, 422-23, 396 N.E.2d 499; *In re Marriage of Stuckert* (1985), 138 Ill. App. 3d 788, 792, 486 N.E.2d 395.

The trial court, after having the opportunity to observe the witnesses, evaluate their temperaments and personalities, and assess their credibility, concluded that it was in the child's best interest that permanent custody be awarded to Laura. This decision is clearly supported by the record and is not against the manifest weight of the evidence. Therefore, we affirm the trial court's award of custody.

Mr. Soraparu next contends that the trial court's order entered on October 29, 1984, requiring him to pay "$40 a week or 20% of his net salary whichever is greater" was an abuse of discretion because he was not present and no evidence was offered regarding his ability to pay the increased amount. The record reveals that the court's decision to increase child support came about as a result of a discussion between the court, the guardian *ad litem*, and the lawyers for both sides.

We find no merit in James' argument. It is evident from a reading of the transcript that James' attorney agreed to the entry of the court's order. He stated that he would advise James of the court's order and encourage him to begin paying the increased support. Although James' attorney initially suggested that a hearing be held to determine James' ability to pay the increased amount, he did not pursue this issue, and we do not find that such a statement amounted to an objection for the purpose of preserving this issue for appeal.

If in fact James was unhappy with the court's order, the proper procedure was to move to vacate or modify it. He did not, but instead James apparently chose to ignore the order. It is well settled that an issue not presented in the trial court and properly preserved cannot be raised for the first time on appeal. (See *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147, 324 N.E.2d 417; *Tippet v. Tippet* (1978), 65 Ill. App. 3d 1018, 1020, 383 N.E.2d 13.) Since neither James nor his counsel objected to the trial court's order, we find that this issue was waived and, therefore, need not decide the issue.

James' final argument is that the trial court abused its discre-

tion in ordering him to pay a $500 fee to the attorney who was appointed to serve as the child's guardian *ad litem*. Specifically, James contends that there was insufficient evidence presented to support the award. We agree.

■ Section 506 of the Marriage Act (Ill. Rev. Stat. 1985, ch. 40, par. 506) provides the trial court with the authority to appoint an attorney or guardian *ad litem* for the minor child in a dissolution proceeding and for the awarding of fees and distribution among the parties as appropriate. Regarding the awarding of fees, section 506 provides "[t]he court shall enter an order for costs, fees and disbursements in favor of the child's attorney and guardian *ad litem*, as the case may be. The order shall be made against either or both parents, or against the child's separate estate." The decision regarding the allowance and amount of fees to be awarded a guardian *ad litem* rests within the sound discretion of the trial court, and will not be disrupted on review unless the discretion is clearly abused. (*Gibson v. Barton* (1983), 118 Ill. App. 3d 576, 582, 455 N.E.2d 282.) The amount to be awarded depends upon the factors and circumstances of each case, and the court in determining the amount must consider the total circumstances involved including the circumstances of the mother and father; the importance, novelty, and difficulty of the questions raised, especially from a family-law standpoint; the degree of responsibility involved from a management perspective; the time and labor required; the usual and customary charge in the community; and the benefits to the client. (118 Ill. App. 3d 576, 582, 455 N.E.2d 282.) Also, the granting of an award is improper where no evidence is presented concerning the services performed, the basis of the award, or the reasonableness of the fees charged for the services performed. See *In re Kersten* (1977), 52 Ill. App. 3d 815, 368 N.E.2d 138; *Murphy v. Murphy* (1975), 31 Ill. App. 3d 321, 334 N.E.2d 779.

■ A review of the record in this case indicates that there was insufficient evidence to support the award of a $500 fee to the guardian *ad litem* and, accordingly, the award was an abuse of discretion. Although the guardian testified that he spent "25 hours or more" on this case, no showing was made concerning what particular services were included in these "25 hours or more," nor was there any indication of their necessity. General statements concerning the number of hours spent, without more, is an insufficient basis for the allowance of fees. (See *Tippet v. Tippet* (1978), 65 Ill. App. 3d 1018, 1021, 383 N.E.2d 13.) Also, contrary to the specific requirement in the trial court's order, the guardian *ad litem* in this

case did not file a written report regarding the custody of the minor child. Under these circumstances, the awarding of the fee was improper.

Therefore, we reverse the trial court's order requiring James to pay $500 in fees to the guardian *ad litem* and remand the matter to the trial court for such hearings as necessary to determine the value of the services rendered by the guardian *ad litem* and the amount of any such fee properly chargeable to the respondent.

Thus, for the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part and the cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part and reversed in part.

O'CONNOR, J., concurs.

JUSTICE BUCKLEY, specially concurring:

I concur with the majority in the disposition of this case, but am constrained to add that the trial court, upon remand, in determining the fee to be paid the guardian *ad litem*, if any, should additionally consider that he has already charged and received a fee of $500 from the wife notwithstanding that the statute provides that the trial court shall set the fee of an appointed guardian *ad litem* or attorney for the child and determine by whom it shall be paid.

The attorney for the child is in an excellent position to ameliorate the views and actions of the litigants and greatly aid the court in this most awesome aspect of domestic relations, but failure to respond to written letters of complaint of his spouse's treatment of his child whether the allegations were real or imagined and accepting a fee from the mother without a prior court order prior to the custody determination created the appearance of partiality, exacerbated the ill feeling between the litigants and thwarted any possibility of an amicable disposition of the litigation.