*In re* MARRIAGE OF SANDRA L. SCHMITT, Petitioner-Appellant, and KIM A. SCHMITT, Respondent-Appellee.

Second District   No. 2—07—0623

Opinion filed April 30, 2009.—Rehearing denied July 14, 2009.

Randy K. Johnson, of Ariano Hardy Nyuli Johnson Richmond & Goettel, P.C., of South Elgin, and Theodore L. Kuzniar, P.C., of St. Charles, for appellant.

Michael C. Doyen, of Law Office of Robert A. Chapski, Ltd., of Elgin, for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Petitioner, Sandra Schmitt, appeals from the trial court's judgment of dissolution of her marriage to respondent, Kim Schmitt. On appeal, Sandra argues that: (1) "[T]he trial court's 'non-marital' classification of all parcels of real estate purchased by [Kim] during [the] marriage was against the manifest weight of the evidence and must be reversed"; (2) "The trial court's non-marital classification of Bricks, Inc., a corporation created by [Kim] during [the] marriage, was against the manifest weight of the evidence and must be reversed"; and (3) "When the trial court errs in its classification of property and consequently errs in its distribution of marital property, all interrelated support and fee contribution issues must also be reversed and remanded for redetermination and redistribution." We reverse and remand for further proceedings consistent with this opinion.

## FACTS

Sandra and Kim were married on October 13, 1974. Two children were born to the parties during the marriage: Brent, born February 11, 1980, and Samantha, born December 21, 1981. Both children are

emancipated. The marriage broke down in 1995 when Kim told Sandra that he wanted a divorce. The grounds of irreconcilable differences were established.

Sandra, age 59, is in good health and earned a college degree prior to the marriage. Early in the marriage, she was employed as an elementary school teacher, working until the parties' first child was born, and then she became a stay-at-home mother. Kim, age 60, is also in good health and earned a college degree prior to the marriage. At the time of trial in February through June 2006 he was the president and sole shareholder of Bricks, Inc., a subchapter S corporation. See 26 U.S.C. §1366 (2006).

Kim testified that he began working at Colonial Brick Company (Colonial), a subchapter S corporation, in 1969. In 1970 he was given partial ownership of Colonial. In 1972, he was given a 49% ownership interest in Colonial by Phillip Mumford, who owned the remaining 51% of the corporation. Before the parties were married, a Colonial balance sheet labeled "February 1974" showed that Kim had an accumulated earnings and savings account in the sum of $5,661.82, which represented his share of the business.

Kim testified that in 1977, Kim and his partner, Mumford, bought two parcels of property on Kedzie Avenue in Chicago.[1] The titles to the properties were not held in the name of Colonial, but individually, by Kim and Mumford. The down payments and mortgages for these properties, $17,500 and $100,000, respectively, were paid out of Colonial's retained earnings account. At the end of the year, these payments, made on behalf of Kim and Mumford, were reflected on Colonial's books as distributions to Kim and Mumford in their respective ownership percentages. In addition to the Kedzie properties, between 1974 and 1978 Kim and Mumford bought real estate in Kentucky and on Cermak Road in Chicago. They also formed the following companies or business interests: Aggressive Leasing, Emergency Demolition Contractors, Appalachian Hardwood Products, and a sawmill.

Kim testified that in 1976 Kim and Mumford formed a partnership, Aggressive Leasing, for the purpose of maintaining and leasing heavy equipment. In 1978 Kim and Mumford formed a Missouri corporation, CBC Bricks, Inc., for the purpose of reselling used brick, demolishing and developing real estate, and selling off the assets. Kim and Mumford owned CBC Bricks equally. In 1978 Kim and Mumford ended their business relationship, and as part of their separation agreement Kim received, among other things, 100% of the CBC Bricks stock.

[1] 3415 and 3425 Kedzie Avenue.

The trial court admitted into evidence the June 1978 agreement that dissolved all business interests between Kim and Mumford. Kim testified that the agreement provided that Kim was to receive both Kedzie properties, a partnership interest in Aggressive Leasing, and a percentage interest in Emergency Demolition Contractors. Deeds to the Kedzie properties were placed in a land trust with Kim as sole beneficiary, agent, and nominee of the trust. Between 1974 and 1978, Sandra and Kim paid tax on income distributions received from Colonial.

Kim testified that in June 1978 he incorporated a new company, Bricks, Inc., a subchapter S corporation. Bricks received the assets from Colonial when Kim and Mumford dissolved their business interests. Bricks continued to make the mortgage payments on the two Kedzie properties.

Kim stated in an affidavit that in 1978 he and Mumford, each as individuals (Kim, d/b/a Schmitt Farms), bought 160 acres in Sublette, Illinois (Schmitt Farms). Colonial paid the down payment for the property in the percentages of ownership held by Kim and Mumford (*i.e.*, 49% and 51% respectively). Subsequently, Mumford withdrew from the contract, and Kim's parents were substituted and given a one-third interest with Kim retaining a two-thirds interest. Kim stated that his interest was paid for by Bricks, through a joint checking account held in the parties' names. Kim's parents gave Sandra a check for their portion. Sandra consolidated the mortgage payments, issuing checks from Sandra and Kim's joint checking account from 1979 through 1989. Sandra submitted copies of cancelled checks showing that she paid the mortgage payments on Schmitt Farms from the parties' joint checking account for the subject period. Sandra testified that the payments were made using funds from Bricks, which Kim deposited into the joint checking account. Kim stated in his affidavit that he subsequently bought an additional 80 acres, for $1,100 an acre. Bricks paid the down payment and the mortgage payments for the additional 80 acres. Title to the additional 80 acres was held in the land trust of which Kim was the sole beneficiary. In 2003 Kim sold to his mother his entire interest in Schmitt Farms for approximately $160,000. Kim testified that Bricks had no interest in Schmitt Farms.

In 1980 the parties bought a home in Woodstock, Illinois, for $160,000 to $170,000, with the title held jointly by the parties. It was sold in 1988 for $258,000. In 1982 the parties bought a home in Batavia, Illinois, for $210,000. The family continued to live in the Woodstock home until extensive renovations were completed at the Batavia home in 1988. The mortgage for the Woodstock home was paid by

Bricks until 1988, and title was held by Bricks. Sandra testified that the mortgage payments were paid from the parties' joint checking account, using funds that Kim received from Bricks. According to Sandra, in 1992 Kim told her that he would pay the mortgage from that point forward using Bricks' funds only.

Kim also testified that in December 1986 he bought 22.3 acres of land in Geneva, Illinois, for $188,887. The price was paid in full in February 1989. The Geneva land was titled in Kim's name, solely. Kim testified that the payment was charged against his capital account and that he assumed that Bricks paid for the land, but he was unsure if the payment was charged against him personally at year end, against his retained earnings account. Then Kim testified that he did not know how the purchase was addressed on Bricks' accounting books. The Geneva land was subdivided into 60 lots, and homes were built on them by CBC Bricks, the Missouri corporation completely assigned to Kim in 1978 when he and Mumford ended their business relationship.

An affidavit submitted by Kim stated that in the 1980s he bought 289 acres of land in Pontiac, Illinois, for $400,000. Kim testified that the funds used to buy this property came from the Bricks operating checking account. He also testified that he had no idea if the funds were charged against his retained earnings account. Title to the property was held by a land trust in which Kim was the sole beneficial interest holder. Bricks made all of the mortgage payments on the property and satisfied the mortgage prior to its sale in 2004, for $604,548.

Kim's affidavit also stated that in the 1980s Kim bought 149 acres of land on Randall and Orchard Roads in Batavia, Illinois, directly west of Mooseheart, for approximately $400,000. Title to the property was held by a land trust in which Kim held sole beneficial interest. The down payment and all mortgage payments were made by Bricks. Kim did not know if these payments were "adjusted" as charges against his retained earnings account.

Kim's affidavit stated that in the early 1990s he purchased 50 acres of land at Interstate 88 and Orchard Road in Batavia, Illinois, for $1 million. The mortgage payments were paid by Bricks, and title to the property was held by a land trust in which Kim was the sole beneficial interest holder. This property has been cross-collateralized with a business loan. However, only interest, not principal, on the note has been paid. Kim did not know if these payments were adjusted to charge his retained earnings account.

Kim testified that in the mid to late 1990s he bought property on LaSalle Street in Aurora, Illinois. Kim testified that he bought other real estate in Aurora at the same time he bought the LaSalle proper-

ties. This constituted a "bulk deal" for a $60,000 payment.[2] Bricks paid for the property; the titles were held in Kim's land trust, which named him as sole beneficiary, agent, and nominee. Bricks used the property as an extension of its business but did not pay rent to the trust or to Kim. Kim testified that he did not know whether the payment for the property was charged in Bricks' books as a personal distribution to him at the end of the year.

Kim submitted a summary document, along with supporting documentation, showing that from 2000 through 2006 he paid a total of $895,000 from the Bricks account for expenses for Sandra and the parties' children. The $895,000 included $191,000 in maintenance; $220,016 distributed per court order; $320,565 in mortgage interest; and $95,553 in property taxes for the Batavia home.

Steven Albert, a certified appraiser, testified on behalf of Sandra as an expert in appraising the fair market value of real property. Albert testified that he used comparable properties to arrive at his estimate of the fair market value of each property at issue. Albert conducted site visits for the appraisals, though he did not personally view all the properties because he had only two weeks to prepare his report.

Robert J. Gross, a business evaluator, testified as an expert in business valuation. Gross opined that Bricks, as a subchapter S corporation, had a net fair market value of $2,654,000. The trial court accepted Gross's valuation opinion. Gross testified that if a check is paid out of a business for the benefit of the sole shareholder and is not booked as an income expense, it would have to be booked as a distribution of previously taxed but undistributed income or as a repayment of a loan from a shareholder. Gross stated that, if Sandra wrote a check from Bricks' account to buy real estate that was titled in Kim's name, it would be Kim's own property. The only way to track distributions to the shareholder(s) of a subchapter S corporation over time is by calculating the difference in the corporation's retained earnings account. The retained earnings account reflects the amount of previously taxed income carried forward from year to year minus the amount that has been distributed to the shareholder(s). For Bricks, that would apply to a 27-year period.

Sandra's counsel attempted to show Gross a document that showed retained earnings from 1980 through 1998, so that Gross could offer an analysis of the document. However, the document was barred by the trial court because it contained tax returns that the trial court had previously barred.

---

[2]The bulk deal included 716 S. LaSalle, 723 LaSalle, and lots 14 and 16 on LaSalle, all in Aurora, Illinois.

John O'Dwyer, also a certified appraiser, testified on behalf of Kim as an expert in appraising the fair market value of real property. O'Dwyer appraised four properties: the Kedzie properties ($830,000); 718 Hamilton, Aurora ($120,000); Schmitt Farms ($552,000); and the LaSalle properties ($460,000).

The trial court found that Kim's ownership interest in Colonial was acquired prior to the marriage and was nonmarital property. Because the Colonial funds were nonmarital, the trial court ruled that Kim sustained his burden of proving by clear and convincing evidence that all of the properties and businesses purchased with Colonial funds were nonmarital property.[3] The trial court also found that Kim sustained his burden of proving by clear and convincing evidence that the properties and businesses purchased with Bricks' funds were non-marital, because Bricks' was nonmarital.[4] However, the trial court found that Kim's "personal efforts contributed significantly to the growth and value of Bricks, Inc." The trial court found that Kim's yearly salary was only approximately $20,000 throughout the marriage. The trial court found that Kim did not need to reimburse the marital estate with his nonmarital assets because from 2000 through 2006 he adequately compensated the marital estate with his salary and "other payments made by Bricks, Inc., for the benefit of [Sandra] and the children [in the amount of $895,000]."

However, because Kim deposited Bricks' funds into the parties' joint checking account to pay for part of the mortgages and real estate taxes for the Batavia residence and Schmitt Farms, Kim had to reimburse the marital estate $121,794 and $78,928, respectively.

The trial court found that the gross value of Kim's nonmarital property was $11,591,000 and the net value of Kim's nonmarital property was $6,091,000. The trial court found that the value of the marital property was $350,722. The trial court awarded Sandra 100% of the marital property minus $150,000 for her dissipation of the marital assets, for a total award of $200,722. The trial court ordered Kim to pay Sandra $1 million in gross maintenance and arrearage. Each party was ordered to pay his or her own attorney fees. This timely appeal followed.

## ANALYSIS

### A. Motions to Strike

■ Initially, we must address Sandra's motion to strike a portion of Kim's reply brief which cites an unpublished Supreme Court Rule

---

[3]Including the Kedzie properties.

[4]Including Schmitt Farms; 718 Hamilton; the LaSalle properties; the 149 acres at Randall and Orchard Roads; and the 50 acres at I-88 and Orchard Road.

23 order (*In re Marriage of Mugnolo*, No. 1—05—2839 (May 4, 2007) (unpublished order under Supreme Court Rule 23)) and discusses it at length to support Kim's arguments. Supreme Court Rule 23(e) provides in pertinent part:

> "Effect of Orders. An unpublished order of the court is not precedential and may not be cited by any party except to support contentions of double jeopardy, *res judicata*, collateral estoppel or law of the case." 166 Ill. 2d R. 23(e).

Because Kim does not cite *Mugnolo* for any of the proper bases listed in Rule 23, we grant Sandra's motion to strike.

■ Next, we address Kim's motion to strike portions of Sandra's reply brief that refer to an article written by B. Greenstein in December 1992 and published on July 5, 2002, in the "CPA Journal" by the New York State Society of CPAs, and to a Federal Internal Revenue Service audit report regarding subchapter S corporation officer compensation. Kim urges this court to strike these references because they constitute evidence not contained in the record on appeal. Sandra correctly argues that these references are not evidence, but citations to secondary authorities that have been properly cited by litigants and reviewing courts to support arguments and holdings, respectively. See, *e.g.*, *People v. McKown*, 226 Ill. 2d 245, 273-74 (2007) (citing numerous articles); *Tobias v. Autore*, 182 N.J. Super 328, 333, 440 A.2d 1171, 1178 (1982) (citing the CPA Journal). Therefore, Kim's motion to strike the references to the article and report is denied. We now address the merits of this appeal.

## B. Standard of Review

■ Before a trial court may dispose of property upon dissolution of marriage, the property must be classified as either marital or nonmarital. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (2000). The trial court's classification will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 663 (2008). There is a rebuttable presumption that all property acquired by either spouse after the date of marriage but before the entry of judgment of dissolution is marital property, regardless of how title is held. 750 ILCS 5/503(b) (West 2006). A party can overcome this presumption only by a showing of clear and convincing evidence that the property falls within one of the exceptions listed in section 503(a) of the Illinois Marriage and Dissolution of Marriage Act (the Act) (750 ILCS 5/503(a) (West 2006)). *Didier*, 318 Ill. App. 3d at 258. The party claiming that the property is nonmarital has the burden of proof, and any doubts as to the nature of the property are resolved in favor of finding that the property is marital. 750 ILCS 5/503(a) (West 2006); *Didier*, 318 Ill. App. 3d at 258.

## C. The Trial Court's Classification of All Parcels and Businesses Purchased by Kim During the Marriage Is Against the Manifest Weight of the Evidence

On appeal, Sandra first argues that the down payments and mortgage payments for the properties were paid from income because they derived from distributions from either Colonial or Bricks. Further, that income was attributable to the personal efforts of Kim. Therefore, according to Sandra, the funds used to purchase the properties at issue were marital property, which renders the properties marital as well.

### 1. Real Properties and Businesses Purchased by Colonial

Kim argues that his testimony, corroborated by Mumford, established that funds were drawn from the operating account of Colonial to purchase these real properties and businesses, and, therefore, the properties and business at issue should be classified as nonmarital.

Section 503(a)(8) of the Act provides that income from nonmarital property of a spouse becomes marital income unless the spouse claiming that it is nonmarital proves by clear and convincing evidence that the income is "not attributable to the personal efforts of [the] spouse." 750 ILCS 5/503(a)(8) (West 2006); see *In re Marriage of Dunlap*, 294 Ill. App. 3d 768, 779 (1998).

■ In this case, it is undisputed that Kim worked for Colonial and that he was given distributions to make the down payments and mortgage payments for the Kedzie properties. Kim testified that the payments for the properties, made on behalf of himself and Mumford, were reflected on Colonial's books at the end of the year as distributions to Kim and Mumford in their respective ownership percentages. Thus, the distributions were income to Kim. Kim also testified that he purchased the Kedzie properties as an individual. We find nothing in the record sufficient to rebut the presumption that the distributions were attributable to Kim's personal efforts. Therefore, the trial court's finding that the Kedzie properties were purchased with nonmarital funds, and were thus nonmarital, is against the manifest weight of the evidence.

Regarding the remaining real properties (the property in Kentucky and the property on Cermak Road in Chicago) and businesses (Aggressive Leasing, Emergency Demolition Contractors, Appalachian Hardwood Products, and the saw mill) purchased by Colonial, Kim testified that funds from Colonial were used to purchase them. Kim could not recall, specifically, what funds, if any, were charged against his retained earnings account for these real estate and business interests.

"A subchapter S corporation monitors its retained corporate earnings using an account which is then used to determine each shareholder's basis for taxed but undistributed corporate income. However, retained earnings and profits of a subchapter S corporation are a corporate asset and remain the corporation's property until severed from the other corporate assets and distributed as dividends." *In re Marriage of Joynt*, 375 Ill. App. 3d 817, 821 (2007).

Accordingly, Kim failed to establish by clear and convincing evidence that the funds used to purchase these assets were not distributions ("dividends," see *Joynt*, 375 Ill. App. 3d at 821) and, thus, income attributable to his personal efforts. Therefore, the trial court's finding that they were purchased with nonmarital funds is against the manifest weight of the evidence.

Kim notes that both he and Mumford testified that the funds used to purchase the real properties and businesses were drawn from Colonial's operating account. However, this does not negate the fact that Kim could not recall whether these withdrawals were later charged against Kim's retained earnings account, thus constituting a distribution to Kim. Accordingly, Kim's and Mumford's testimony does not change the outcome here.

### 2. Bricks

Sandra also argues that the trial court's classification of Bricks, Inc., a corporation created by Kim during the marriage, as nonmarital property is against the manifest weight of the evidence.

The Act creates a rebuttable presumption that all property acquired after marriage is marital property. See 750 ILCS 5/503(a) (West 2006). "The business interest of a spouse acquired subsequent to marriage constitutes 'marital property' subject to equitable distribution upon dissolution." *In re Marriage of Schneider*, 343 Ill. App. 3d 628, 634 (2003) (citing *In re Marriage of Stone*, 155 Ill. App. 3d 62, 72 (1987)), *rev'd in part on other grounds, In re Marriage of Schneider*, 214 Ill. 2d 152 (2005). Real property and business interests acquired after marriage are presumed to be marital property unless they were purchased with nonmarital funds. *In re Marriage of Eddy*, 210 Ill. App. 3d 450, 456-57 (1991).

The trial court found that Bricks was nonmarital property because it was "formed with funds from [Kim's] non-marital interest in Colonial." It is undisputed that Bricks was acquired after the marriage and, therefore, is presumed to be marital property. Further, because Kim failed to show that the funds from his interest in Colonial were not attributable to his personal efforts, these funds are presumed to be marital property. 750 ILCS 5/503(a)(8) (West 2006); *Dunlap*, 294

Ill. App. 3d at 779. Thus, the trial court's finding that Bricks was non-marital property is against the manifest weight of the evidence.

Further, although retained earnings in subchapter S corporations are generally considered nonmarital, they are considered marital if the spouse has control over the decision to disburse the retained earnings. See *Joynt*, 375 Ill. App. 3d at 819.

In this case, Kim testified that he did not know whether the money from Bricks was credited to his retained earnings account. Kim, as sole shareholder of Bricks, had complete control of and access to the retained earnings. Thus, the inference to be drawn from the evidence is that the funds were attributed to his personal efforts. Accordingly, the retained earnings of Bricks, and all assets Kim purchased with them, are presumed to be marital, and the record does not show that Kim rebutted with sufficient evidence either the inference or the presumption. Thus, the trial court's finding that Bricks and the assets purchased by Bricks were nonmarital is against the manifest weight of the evidence.

Kim notes that he testified that the funds used to purchase the assets were drawn from Bricks' operating account. However, this does not negate the fact that Kim could not recall whether these withdrawals were later charged against his retained earnings account, thus constituting a distribution to Kim. Accordingly, Kim's testimony does not change the outcome here.

### D. The Trial Court's Finding Regarding Reimbursement Is Against the Manifest Weight of the Evidence

■ We note that the trial court also erroneously found that Kim's yearly salary of $20,000 and expenses paid for Sandra and the parties' children for the years 2000 though 2006 from his nonmarital estate adequately compensated them so that he did not need to reimburse the marital estate. This finding is against the manifest weight of the evidence. Kim did not present evidence of his contributions for expenses for Sandra and the children for 1974 through 1999, which constituted most of the parties' marriage. The trial court's finding that $895,000 was sufficient to reimburse the marital estate, from Bricks' gross value along with its purchases of approximately $10,761,000 in real estate, is against the manifest weight of the evidence. Kim did not present evidence sufficient to show that Bricks and the properties purchased by Bricks were nonmarital property.

Kim relies on *In re Marriage of Kennedy*, 94 Ill. App. 3d 537 (1981), to support his argument that Bricks was nonmarital property. In *Kennedy*, the appellate court held that record stores established by the husband before the marriage were nonmarital property but that record

stores he established during the marriage were marital property, even though for the new stores he used money borrowed on credit from the nonmarital record stores. *Kennedy*, 94 Ill. App. 3d at 548. The appellate court held that the new stores were marital and "[did] not come under any exception to the rule that property acquired during the marriage is marital." *Kennedy*, 94 Ill. App. 3d at 548. In this case, like *Kennedy*, Kim established Bricks after the marriage and he failed to establish that Bricks came under any exception to the general rule stated by the court. Therefore, we believe that *Kennedy* supports Sandra's position rather than Kim's.

Kim also cites *In re Marriage of Werries*, 247 Ill. App. 3d 639 (1993), *In re Marriage of Phillips*, 244 Ill. App. 3d 577 (1993), *In re Marriage of Jelinek*, 244 Ill. App. 3d 496 (1993), *In re Marriage of Eddy*, 210 Ill. App. 3d 450 (1991), *In re Marriage of Thacker*, 185 Ill. App. 3d 465 (1989), and *In re Marriage of Kamp*, 199 Ill. App. 3d 1080 (1990), to support his argument that the real properties and Bricks were not marital property. These cases are all distinguishable from the case at bar.

*Werries* is distinguishable because the husband sustained his burden of proof that a partnership property was nonmarital. *Werries*, 247 Ill. App. 3d at 644. The wife did not establish the amount of marital funds paid to retire a portion of a loan, and she had the burden to establish the amount in order to establish the amount of reimbursement to which the marital estate was entitled. *Werries*, 247 Ill. App. 3d at 644. It also appeared that the farmer in *Werries* was a minor partner who did not have the ability to control his distributions (*Werries*, 247 Ill. App. 3d at 643), unlike the husband in *Joynt* (see *Joynt*, 375 Ill. App. 3d at 819).

*Phillips*, 244 Ill. App. 3d 577, is distinguishable from this case because it does not discuss the personal efforts of the husband that transformed the income from the nonmarital property into marital property. See 750 ILCS 5/503(a)(8) (West 2006). Further, there is nothing in *Phillips* to indicate that the husband drew cash out of the business to purchase real property and title it in his own name, as Kim did in this case. Thus, *Phillips* is not applicable here.

*Jelinek* is distinguishable from this case because class B stock of a publically traded corporation the husband received was due to appreciation under section 503(a)(7) and was not considered compensation. *Jelinek*, 244 Ill. App. 3d at 505. In this case, Kim had sole control over the decision to make distributions from Bricks, and he received distributions, or "income," from Colonial and Bricks. Therefore, *Jelinek* is not applicable here.

In *Eddy*, the property at issue was all traced back to property that was nonmarital because it was gifted to the husband by his father. *Eddy*, 210 Ill. App. 3d at 453, 457-58. In this case, the funds used to buy the real properties presumably came from income distributed to Kim. Again, we note that Kim had complete control over whether to distribute the funds from Bricks; thus, the funds were marital property. See *Joynt*, 375 Ill. App. 3d at 819. Accordingly, *Eddy* does not apply.

*Thacker*, 185 Ill. App. 3d 465, is distinguishable from the case at bar because *Thacker* does not discuss the husband's personal efforts that transformed the income from nonmarital property into marital property. See 750 ILCS 5/503(a)(8) (West 2006). Thus, *Thacker* is not applicable here.

*Kamp* is distinguishable because the appellate court determined that the property at issue remained nonmarital because it increased in value pursuant to section 503(a)(7) of the Act. *Kamp*, 199 Ill. App. 3d at 1083. In this case, Kim purchased properties with income acquired through his personal efforts. Thus, *Kamp* is not controlling.

We find erroneous the trial court's classification and distribution of the marital property. Therefore, we remand to the trial court for redetermination and redistribution.

## E. Distribution Of Marital Property, Maintenance, and Attorney Fees

■ Sandra argues that, when the trial court errs in its classification of property and consequently errs in its distribution of marital property, all interrelated support and fee contribution awards must be reversed and the cause remanded for redetermination and redistribution based on all of the marital property. We agree with Sandra and direct the trial court to reconsider these issues on remand. See *In re Marriage of Feldman*, 199 Ill. App. 3d 1002, 1006-08 (1990).

Based on the foregoing, we reverse the judgment of the circuit court of Kane County and remand the cause for further proceedings consistent with this opinion.

Reversed and remanded.

ZENOFF, P.J., and HUTCHINSON, J., concur.