JUDITH PALMER McCLELLAND, Petitioner-Appellant, v. DONALD K. McCLELLAND, Respondent-Appellee.

First District (1st Division) No. 1—90—0489

Opinion filed June 8, 1992.

Craig B. Hammond, of Chicago, for appellant.

Mel Sloan, of Chicago, for appellee.

JUSTICE MANNING delivered the opinion of the court:

Petitioner, Judith Palmer McClelland (hereafter Judith), appeals from an adverse order granting the petition of respondent, Donald K. McClelland (hereafter Donald), changing sole physical custody of their son, Marc, to him. The issues raised on appeal are:

(1) Whether the trial court's custody modification order entered pursuant to section 610 of the Illinois Marriage and Dissolution of Marriage Act (hereafter Act) (Ill. Rev. Stat. 1987, ch. 40, par. 610) was proper;

(2) Whether the trial court's evidentiary rulings and other complained-of conduct of the trial judge deprived Judith of a fair trial; and

(3) Whether the trial court properly apportioned the fees for the guardian *ad litem* for Marc pursuant to the statutory requirements of sections 506 and 508 of the Act. Ill. Rev. Stat. 1987, ch. 40, pars. 506, 508.

BACKGROUND

Judith and Donald were married on August 26, 1977, and their only child, Marc, was born on September 22, 1981. The marriage was dissolved on March 7, 1986, and pursuant to the marital settlement agreement incorporated therein, the parties agreed to legal joint custody of Marc, with Judith having physical custody and Donald having liberal visitation rights.

On April 29, 1986, Judith filed an emergency petition for modification of custody and visitation and for other relief, alleging that Marc had been sexually abused by his father. Donald retained legal counsel, who immediately filed a response to Judith's petition and an emergency petition on Donald's behalf for an order of visitation. Counsel also advised Donald to contact Dr. Nahman Greenberg about

conducting an examination of Marc. Meanwhile, Judith placed Marc in the Mt. Sinai Pediatric Ecology Unit for a five-day sexual abuse evaluation. However, that same day, when Donald learned about Marc's hospitalization, he contacted his attorney and Dr. Greenberg and arranged to have Marc discharged on May 6, 1986, prior to the completion of the medical evaluation.

On May 9, 1986, Judith appeared in court on an emergency motion requesting Marc's readmittance to Mt. Sinai to complete the evaluation, and without prejudice to Donald's rights to a hearing, the court temporarily terminated his visitation rights. At the suggestion of counsel, the trial court also ordered the parties to contact Dr. Greenberg regarding an in-patient evaluation of Marc.

Dr. Greenberg was appointed pursuant to section 604 of the Act to conduct an independent evaluation of Marc relative to sexual abuse. He conducted a mental examination and in his report of September 30, 1986, finding no evidence of sexual abuse, thereby recommended that Marc have access to both parties. Dr. Greenberg commenced treating Marc as a private patient sometime during the late summer or the fall of 1986.

On July 15, 1986, Judge Aaron Jaffe granted Judith's motion appointing Dr. Elva Poznanski, chief of child psychiatry at Rush-Presbyterian Hospital, to do a mental evaluation of Marc. In her report, Dr. Poznanski concluded the child had been abused by his father. Also, on July 15, 1986, the trial court appointed David Stein as attorney for Marc.

In the interim, discovery was conducted and several pleadings were filed, which included petitions by Donald for visitation and a petition seeking the selection of a therapist for Marc. The trial court ordered therapy for Marc in July 1986 and appointed Dr. Robert Bussell as his therapist.

Sometime in July 1987 Judith reported to Dr. Bussell and Marc's treating physician, Dr. Alan Ravitz, that Marc had become suicidal. As a consequence, Marc was hospitalized at Chicago Lake Shore Hospital from July 1987 through April 1988.

Dr. Ravitz diagnosed Marc as having post-traumatic stress disorders of an uncertain origin. He was unable to determine if Marc had been sexually abused but found that Marc was fearful of his father for unspecified reasons, that Marc exhibited very strange behavior during hospitalization, and that Marc definitely had dissociative tendencies.

Judith's April 29, 1986, petition to terminate joint custody and restrict visitation rights finally was set to proceed to trial on May 9, 1988. However, on that date, the matter was continued. An agreed

order was presented to the court on June 17, 1988. The parties agreed, in part: (1) to terminate the joint custody provision; (2) that Judith was granted sole custody; and (3) that Marc was to be allowed visitation, supervised or unsupervised, as determined by Dr. Ravitz; and (4) that Marc would enter treatment with psychologist Perry Meyers.

Thereafter, Donald sought to modify the agreed order by filing a petition on October 13, 1988, to establish visitation and supplemental and amended petitions in 1989 for modification of restricted visitation and transfer of custody. In preparation for the modification proceeding, Donald retained Dr. Ner Littner as an expert pursuant to Supreme Court Rule 215(a) (134 Ill. 2d R. 215(a)). Dr. Littner, who was allowed to conduct mental examinations of Judith and Marc, filed an affidavit in support of Donald's petition for modification, stating that Judith suffered from paranoid schizophrenia and delusion. He further averred that Judith's psychotic disturbance was a direct cause of Marc's psychiatric hospitalization at Lake Shore Hospital.

The hearing on modification of custody commenced on October 12, 1989. In the following weeks, after hearing from several doctors, hospitals, agencies, the parties themselves, and conducting two *in camera* interviews of Marc, the trial court proceeded to award custody to Donald. Thereafter, on January 19, 1990, the trial court entered its "corrected order" which consisted of a 40-page opinion of summary of facts, findings of fact, and conclusions. On January 23, 1990, Judith's motion for reconsideration was heard and denied. David Stein, the guardian *ad litem* who represented Marc, filed a petition for attorney fees, which was heard on March 12, 1990. The trial court ordered Judith to pay two-thirds of $17,422 in fees and Donald the remaining one-third.

Judith contends that modification of custody by the trial court is against the manifest weight of the evidence and that Donald failed to meet the "endangerment" requirement of section 610(a). We disagree.

Section 610 in its entirety provides:

"Unless by stipulation of the parties, no motion to modify a custody judgment may be made earlier than 2 years after its date, unless the court permits it to be made on the basis of affidavits that there is reason to believe the child's present environment may endanger seriously his physical, mental, moral or emotional health.

(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were

unknown to the court at the time of the entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody, and that modification is necessary to serve the best interest of the child. In the case of joint custody, if the parties agree to a termination of a joint custody arrangement, the court shall so terminate the joint custody and make any modification which is in the child's best interest. The court shall state in its decision specific findings of fact in support of its modification or termination of joint custody if either parent opposes the modification or termination." Ill. Rev. Stat. 1989, ch. 40, par. 610.

■ As previously stated, commencing in October 1988 through the early part of 1989, Donald filed several petitions and supplemental petitions to modify the June 17, 1988, custody order. Following discovery and court-ordered examinations of the parties involved, the hearing on Donald's petition for modification began in October 1989. Since Donald filed the petition for modification less than two years after the date of the entry of the prior custody judgment (see Ill. Rev. Stat. 1989, ch. 40, par. 610(a)), and the hearing was held prior to the expiration of the two-year period (see *In re Custody of Dykhuis* (1985), 131 Ill. App. 3d 371, 373, 475 N.E.2d 1107), he was required to meet the "endangerment" section of subsection (a). Additionally, the standards of subsection (b) must be met. Ill. Rev. Stat. 1989, ch. 40, par. 610(b); *In re Custody of Carter* (1985), 137 Ill. App. 3d 439, 484 N.E.2d 1175.

After reviewing section 610 and the applicable decisional law, we agree with Judith that the burden of proof was upon Donald. The trial court could only modify the June 17, 1988, custody judgment if it found that Donald by clear and convincing evidence established that there is reason to believe that Marc's "present environment may endanger seriously his physical, mental, moral or emotional health" (Ill. Rev. Stat. 1989, ch. 40, par. 610(a)) and further established that "facts *** have arisen since [entry of] the prior judgment or *** were unknown to the court at the time of [the] entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian *** and that the modification is necessary to serve the best interest of the child" (Ill. Rev. Stat. 1989, ch. 40, par. 610(b)). Having reviewed the record, we find that Donald sustained his burden of proof and that the trial court properly modified the prior custody order under the applicable statutory guidelines.

The following testimony and evidence was presented during the hearing. Judith, then 36 years old and a self-employed psychiatric social worker, testified that after reading a book on sexual abuse, by the fall of 1987, she was convinced that her son Marc was being ritualistically abused by a cult and sexually abused by Donald. She also suspected that her mother once was in the cult and that the baby-sitter, realtor, dentist, a neighbor and his wife, and members of the hospital staff where she was hospitalized in October of 1988 were cult members. She believed that Donald was a member of the cult, that he murdered people or caused them to be murdered and that he went to rituals and drank the blood of children. Judith also stated that conduct relating to Donald's abuse of Marc occurred as early as October 1985; however, she acknowledged that this conduct occurred prior to the divorce and her agreement to joint custody.

In her own professional practice, Judith commenced treating dissociative disorders in January 1987 and believed that Donald and Marc both had a dissociative disorder. She stated that Marc did well in school although he "switched" personalities, got out of control, became unmanageable, bit, kicked and pushed, and in five separate incidents, rubbed feces on the bathroom walls and toilet. She also related that Marc engaged in erotic or sexualized behavior toward her and tried to touch and pinch her breasts and that Marc said "Daddy kisses my penis and I kissed his penis" in an effort to get her to touch his (Marc's) penis. Marc cried whenever he had to go visit Donald and pleaded with her to stay home. Marc also told her that he wanted to kill himself and when Judith told Dr. Bussell of Marc's suicidal incidents, he referred her to Dr. Ravitz. Dr. Ravitz then hospitalized Marc at Lake Shore Hospital.

Judith further stated that Dr. Myers, who was appointed by the court to treat Marc, was not qualified and that his treatment as such was dangerous for Marc. She also believed Dr. Greenberg was unprofessional and that his approach was dangerous and, for that reason, she sought out and selected Dr. Poznanski to do a second evaluation. At first, Judith denied having threatened to ruin Donald, but acknowledged having made such threats on a telephone tape when the tape was played in court. Judith indicated that she was currently being treated by Dr. Jean Goodwin, a psychiatrist in Milwaukee, and had been taking a drug called Tegretol since early 1988. She had been hospitalized twice at Rush-Presbyterian Hospital by Dr. Bennett Braun in late 1988 and her final diagnosis was major depressive disorder with mood incongruent psychotic features.

Judith also testified that she had contacted the FBI, had been in

contact with Jean Goodman, an authority on sex abuse, and Gloria "Stiemen [sic]" of NOW, and that she would go to the press and appeal to the media. It was also discerned that prior to each evaluation of Marc by an expert, Judith presented him or her a detailed written report explaining the grounds for her allegations of sexual abuse. She also admitted giving Marc prescription drugs on several occasions and was unsure who prescribed them. She believed that she had been sexually abused by her father as a small girl.

Donald received his B.A. from Midland Lutheran College in 1969 and was a minister at Ebeneezer Lutheran Church from 1973 to 1979. At the time of the trial, he was 42 yeas of age, had a doctorate in clinical psychology and was engaged in private practice. Donald stated that after Marc was born, both parents shared in the parenting. He reflected that he and Judith took turns bathing Marc, dressing him and taking him to preschool or the baby-sitter. Until his visitation was cut off, he enjoyed an excellent relationship with Marc; they went fishing, to crafts and played on the swings.

When the couple began experiencing marital difficulties, Donald commenced to abuse alcohol; however, after the couple separated in May 1985, Donald stopped drinking. He received the petition to terminate visitation in April 1986 and shortly thereafter, his visitation rights were almost completely cut off. He saw Marc on one occasion in Dr. Greenberg's office in August 1986 but did not see him again until his once weekly visits when Marc was hospitalized at Lake Shore Hospital. No visitation arrangements were made when Marc was released from the hospital in March 1988 and Donald did not see his son again until September 1989 when visits in the office of Dr. Meyers began in compliance with the court's order of therapy for Marc. With respect to the allegations of sexual abuse, Donald revealed that Marc had three rectal examinations and that an investigator from the Department of Children and Family Services (DCFS) had made two reports and two findings.[1]

Donald testified that the agreed order of June 17, 1988, allowed Dr. Ravitz to decide whether Marc's visits with his father were to be supervised or not. Donald stated that he only agreed to the order so that he could see Marc. He felt that he had no other alternative but to sign the order because his attorney told him that it was the only way Donald would see his child. He did not feel that his signing the order

---

[1]The two DCFS reports are referred to by the trial judge in his written opinion and order and are referenced at other times in the record; however, the reports themselves are not a part of the record on appeal.

was the final resolution of the matter.

Donald claimed during the hearing that at the time he signed the order, he didn't know about Judith's hospitalizations and no one had seen her records. Judith, convinced that Marc had been sexually abused by his father and subjected to ritual abuse, was herself hospitalized at Rush-Presbyterian for five days at the beginning of October 1987 and again from October 22, 1987, to December 30, 1987. As previously stated, Dr. Ravitz released Marc from the hospital in April 1988. He released Marc to Judith upon the condition that he review Judith's mental condition with the doctors at Rush-Presbyterian and, based upon this consultation and on his own observations, found her to be delusional. Dr. Ravitz also recommended increased supervised visitation between Donald and Marc. Thus, pursuant to the agreed order and Dr. Ravitz's instructions, Donald was able to see Marc again. Almost three years had passed since he had unsupervised visitation with Marc.

Donald further testified that he now believed it would be better if Marc was with him because Judith was mentally ill and her delusions were destroying Marc's personality. Donald stated that if given custody of Marc, he planned to live in Palatine, Illinois, keep Marc in the same school and continue Marc's therapy with Dr. Myers. With respect to Marc's repeated evaluations and hospitalizations, Donald responded that he initially believed them to be more harmful to the child and had Marc released from Mt. Sinai and disagreed with the stay at Lake Shore. However, after reconsideration, Donald stated that he now believed that hospitalization at Lake Shore had some advantages because it kept Marc away from Judith and allowed Donald to have supervised visitation one day a week.

Dr. Greenberg, who had 30 years' experience in the field of sexual abuse, testified that he was appointed by the court to conduct an examination of Marc soon after Judith filed her petition to terminate Donald's visitation rights. His report of September 30, 1986, was admitted into evidence. Specifically, in that report, Dr. Greenberg concluded that although it was difficult to determine if a young boy in the range of four years old had been molested, in the absence of hard medical evidence, there was no evidence of sexual abuse. Judith had no information to support her contention, Judith suffered from a fixed idea, and it was unnecessary to hospitalize Marc, except that it validated Judith's contentions. Dr. Greenberg stated that both parents made accusations about the other. Judith accused Donald of engaging in a variety of activities including kissing the son's penis. Donald related that both parents bathed together with Marc and that each par-

ent had bathed with Marc individually. He stated that Marc had been exposed to all kinds of stimulation by both parents.

After the evaluation, Dr. Greenberg offered both parents his help in resolving the issue. He thereafter met with Donald for seven or eight sessions, but he was not Donald's therapist and Donald was not his patient. Although Dr. Greenberg's report was complete the year prior to Marc's hospitalization, three years later, he was still of the belief that there was nothing so severe as to warrant Marc's hospitalization. Dr. Greenberg made tapes of Marc and himself, Marc and Donald, and Marc and Judith. The tapes were played in court and explained by the doctor. The doctor stated that Marc appeared normal and relaxed and showed no fear. He saw a "clinical quality" type of relationship between Marc and Judith and that Marc wanted to play longer with his father. Dr. Greenberg further testified that Judith wanted him to validate her accusations against Donald; that the absence of contact with Donald had a long-term adverse effect on Marc; and that Marc was not suicidal and should not be diagnosed as having a dissociative disorder.

Child psychiatrist Dr. Ravitz was called as an expert and testified that he hospitalized Marc in Lake Shore Hospital based on Judith's statements that Marc was suicidal although Dr. Bussell, who was treating Marc prior to the hospitalization, had never indicated that the child was suicidal or sexually abused. Originally, Dr. Ravitz believed that Donald had sexually abused Marc; however, he later concluded that he was unable to determine if sexual abuse occurred. He stated that Marc's language that Donald "abused me sexually, physically, emotionally and in every was possible" was not four-year-old language, but was adult language and thought. He diagnosed Marc as having a post-traumatic stress disorder, but made no determination of the source. He also believed that Judith was the center of her own delusions and that her psychosis could be progressive. Donald was at the center of Judith's delusional system and if she had been sexually abused as a child, she might see sexual abuse everywhere. Dr. Ravitz admitted that he never evaluated Judith. Dr. Ravitz did not believe that Marc had a multiple personality disorder, as Judith had said, but believed that such a belief on Judith's part would affect her parenting.

He further testified that a child should see his father as being good as a necessary part of normal development. Lack of contact places a child at risk and may manifest itself at a later stage. Marc also stated to him that all of the things he had said to the doctor were not true. At a meeting between the attorneys, Dr. Ravitz suggested

supervised visitation between Marc and Donald for one year because their relationship had been destroyed and Marc was originally fearful of his father.

Next, Dr. Elva Poznanski testified on behalf of Judith. She stated that she had no formal training in sex abuse but had helped develop training in sex abuse. Marc was referred to her by Dr. Sacks in July, August, or September 1986 and she saw him 12 times and indicated that she used leading questions, but not in all sessions. She spoke to Judith, who gave her typewritten notes. She used play therapy and anatomically correct dolls in Marc's evaluation and concluded that Marc was disturbed by his parents' divorce, that he could not face calling a "penis" by name, and that he was openly seductive. She sent Marc to Dr. Anderson for testing on a personality profile. She did not recall if Marc had a medical examination and did not request one herself. Dr. Poznanski opined at the conclusion of the evaluation that Marc had been sexually abused and that Dr. Anderson also found the child to be possibly sexually abused. However, at the time of the trial, Dr. Pozanski was a little less certain of her original opinion about sex abuse. She now stated that she failed to clinically evaluate the parents and it would have been helpful to have them tested.

Dr. Perry Myers was the director of child and adolescent psychology at the University of Illinois and treated Marc after his discharge from Chicago Lake Shore Hospital. His initial contact was with Judith, who suggested that he contact other persons about cults. He stated that he was trained to make a diagnosis of dissociative disorder and never saw any indication that Marc suffered from such condition. He had weekly sessions with Marc and arranged one hour weekly visits between Marc and Donald, in his presence. At first, there was a wariness between Marc and Donald; however, as time passed, Marc appeared more at ease with Donald. Marc had some problems but was attempting to set some boundaries. The problems could have a long-term effect on Marc.

Dr. Myers further stated that Marc faced two realities and was uncertain about things that could have happened. Contact with numerous professionals had an effect on Marc's uncertainty. Dr. Myers also believed that normalization of a relationship outside of his office would insure to Marc's benefit.

Dr. Leonard Elkun was Donald's therapist from June 1986 through November 1987 and over the course of the therapy, he interviewed Donald in 130 sessions. He did not believe that Donald had abused his son and thought that Donald was sensitive and sympathetic to Marc. Donald's alcohol abuse was reactive and associated

with the stress of a deteriorating marriage. Donald's problems were in response to being separated from Marc. On cross-examination when questioned about sex abuse, Dr. Elkun talked about incest by a parent versus some third party and was evasive about impulsive versus compulsive behavior. He diagnosed Donald as having anxiety neurosis; one who struggles with undue anxiety symptoms, cannot sleep, and has other difficulties and diminution in the ability to work. He admitted that he was not an expert in sex abuse.

Dr. Bennett Braun, a psychiatrist, was the director of dissociative disorders at Rush-Presbyterian Hospital and Judith's treating physician. He hospitalized her twice and his initial diagnosis was acute paranoid reaction. Upon the first discharge, his diagnosis was adjustment disorder with anxious mood and he treated Judith for anxiety and not depression. However, he changed his diagnosis and on the second hospitalization, found Judith had a major depressive disorder with psychosis. Without therapy, her prognosis was poor. Dr. Leavitt, his psychologist, tested Judith, but was unable to support Dr. Braun's diagnosis and found no depression. Judith was preoccupied with the cult. Dr. Bran's final diagnosis was major depression with mood incongruent psychotic features and that Judith was delusional. Specifically, he determined that Judith had an encapsulated delusion centering around the belief that Donald was a cult member and had involved Marc in cult activities. Upon discharge, Dr. Braun prescribed medication for Judith and referred her for ongoing therapy.

Dr. Ner Littner, a psychiatrist and Supreme Court Rule 215 expert (see 134 Ill. 2d R. 215), evaluated Judith, Donald and Marc and had psychological tests conducted on Donald and Judith to corroborate his own findings. He concluded that the main difference between Judith and Donald was that Judith was severely mentally ill, that Marc was central to her delusional system and that she was concerned about his being harmed by the cult. So much of Judith's illness focused around Marc that there was no physical connection between the two and thus the damage done to Marc by his mother's illness outweighed the separation trauma he would experience in being separated from her. He believed that Marc's hospitalization was a sign of how harmed he was by being with Judith and that there was no evidence that Judith was capable of restoring Marc's relationship with Donald. Dr. Litter reached his conclusions by reviewing various records: psychiatric interviews, available records, psychological tests of everyone except Marc and in talking to Marc's therapist. Judith failed to make available to him hospital records or tests taken during that time.

Following the close of the evidence, the trial judge conducted a second *in camera* interview of Marc. The court had conducted an earlier interview; however, the first *in camera* interview of Marc is not a part of the record on appeal, although it is referred to in Donald's brief and presumably was taken into consideration by the court. During the second interview, Marc told the judge that his father had pushed his (Marc's) face into the pillow and started peeing in his ear. Marc told of another incident where Donald videotaped Marc and another child dancing in the nude. He also told the judge of an incident where Donald shot a number of rabbits and threatened to do the same to Marc and Judith.

■ Based on the reports, evidence and testimony of record, the trial court stated that it was "confident that the court would not have signed, nor would the child's attorney and McClelland's attorney have agreed to the order (June 17, 1988) if the present evidence had been available." We agree. Although, Judith has represented to this court on appeal that the trial court was aware of her condition and prior hospitalization based upon the representations of counsel and the court's own information gathered from the pretrial proceedings, we find the record filed on appeal to be devoid of such evidence. To the contrary, based on the record before us, the facts known to the court at the time it entered the order of June 17, 1988, do not encompass the evidence presented during the custody modification hearing about Judith's illnesses; her satanic beliefs; the effect her delusions have had upon Marc, his prior hospitalizations, or his future welfare. Furthermore, there was little, if any, substantiating evidence regarding Judith's allegations of sexual abuse against Donald. To the contrary, the expert testimony revealed that these allegations were the result of Judith's illness, rather than any factual occurrences.

The trial court ordered, *inter alia*, that the agreed order of June 17, 1988, was vacated; that Judith's petition to restrict visitation was denied; that it was in the best interest of the child that Donald's petition for custody be allowed and that Donald was to take physical custody of Marc immediately; that Judith was to have visitation with Marc every Wednesday and alternate weekends; that Judith was to engage in a program of psychotherapy within 30 days and continue until further order of the court; and that all parties were to engage in family counseling until further order of the court.

Accordingly, we affirm the trial court's finding that it is in the best interest of Marc that Donald's petition for custody be allowed, that physical custody be granted to Donald and visitation to Judith.

■ Moreover, we find no merit in Judith's contention that the

trial court erred in vacating the parties' perfectly valid agreed order of June 17, 1988, where Donald had made no motion to vacate nor had requested such relief in his petition before the court. Inherent in Donald's petition to change custody from Judith to himself is the request that the earlier court order be vacated or modified. Furthermore, the testimony given by Donald during the hearing supports the trial court's conclusion that the June 1988 order was "ill-advised" and that Donald "did not fully comprehend the order and it's significance."

 Judith next argues that the trial court committed reversible evidentiary errors and evidenced bias against her. Although some of the remarks made by the trial judge were inappropriate and better left unsaid, such as the remarks concerning cults, the cumulative effect of such remarks neither deprived Judith of a fair trial nor constituted reversible error. In addition, many of the complained-of statements of the trial court were made in response to the evidence presented and are not indicative of bias, or personal beliefs or actual prejudice on the part of the court so as to prevent it from making a fair determination of the case. See *In re Marriage of Tiscko/Stewart* (1987), 161 Ill. App. 3d 302, 514 N.E.2d 523.

Further, it is well settled that erroneous rulings and improper comments only result in denial of a fair trial if they affect the outcome of the trial. (*Babock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 404 N.E.2d 265.) Here, the trial court did allow into evidence an audio tape from an answering machine, in which Judith made threatening remarks to Donald. However, no objections were made to the admission of the tape, and even assuming error in its admission, such does not amount to reversible error where the tape was merely corroborative of Donald's testimony that Judith had threatened him and that she was motivated by vindictiveness. See *In re Marriage of Padiak* (1981), 101 Ill. App. 3d 306, 427 N.E.2d 1372; *Riley v. Johnson* (1981), 98 Ill. App. 3d 688, 424 N.E.2d 842.

Accordingly, we find no reversible error committed by the trial court and decline to remand the matter.

Finally, Judith contends that the trial court improperly apportioned attorney fees. As stated, pursuant to the statutory authority of section 506 of the Act, the court appointed David Stein as guardian *ad litem* and attorney for Marc.

Section 506 provides:

> "The court may appoint an attorney to represent the interests of a minor or dependent child with respect to his support, custody and visitation. The court may also appoint an attorney

as the guardian-ad-litem for the child. The court shall enter an order for costs, fees and disbursements in favor of the child's attorney and guardian-ad-litem, as the case may be. The order shall be made against either or both parents, or against the child's separate estate." (Ill. Rev. Stat. 1989, ch. 40, par. 506.)

Thus, pursuant to section 506 and section 508(a)(5), which governs the court's authority to order payment of attorney's fees (Ill. Rev. Stat. 1989, ch. 40, par. 508(a)(5)), the court below directed Judith to pay $11,615 and Donald the remaining $5,807 to Marc's attorney.

The standard of review in determining the propriety of the trial court's attorney fee award is abuse of discretion. When considering whether the trial court has abused its discretion, the reviewing court will look to certain factors under section 506. In the case of *In re Marriage of Brophy* (1981), 96 Ill. App. 3d 1108, 421 N.E.2d 1308, this court held that an order for fees and costs in favor of the children's attorney is to be made against either or both parents or the child's separate estate and that the amount to be assessed is necessarily determined by the facts and circumstances of each case. When determining the proper allocation, the court is to consider the total circumstances of the mother as well as the father (*In re Marriage of Soraparu* (1986), 147 Ill. App. 3d 857, 498 N.E.2d 565), which includes consideration of the parents' financial resources and relative ability to pay. *In re Marriage of Kennedy* (1981), 94 Ill. App. 3d 537, 418 N.E.2d 947.

Further, our court has found that the factors which affect the amount of attorney fee awards under section 508(a) also apply to fee awards under section 506. (See *In re Marriage of Soraparu*, 147 Ill. App. 3d 857.) The section 508 factors to consider in a given case include skill and standing of the attorney, the nature of the case, the novelty and difficulty of questions in issue, the amount and importance of the subject matter, the degree of responsibility, the usual and customary charges, and the benefits resulting to the client. *In re Marriage of Armstrong* (1980), 107 Ill. App. 3d 217, 437 N.E.2d 761.

■ In the present case, the parties waived a formal hearing on the question of fees to be paid to the minor's attorney. Thus, no questions are in issue concerning the amount of the fee award. Based upon the representations of the attorneys, Judith's income was approximately $16,000, 50% less than the previous year, as a result of the impact of the litigation. However, the amount did not include the $6,000 received in child support from Donald. Donald's income was reported at $25,000 to $30,000, less the $6,000 for an approximate net of $19,000 to $24,000. Thus, the parties' relative ability to pay the

fees was about equal.

We also reviewed the pleadings involved and the nature of the responses filed by Marc's attorney in his behalf. Based on that review, we cannot conclude that no reasonable person would take the view taken by the trial court. (*In re Marriage of DeBat* (1984), 127 Ill. App. 3d 463, 468 N.E.2d 134.) Judith caused a substantial portion of the post-decree custody litigation. She attempted to restrict and nullify Donald's visitations. (See *In re Marriage of Lewis* (1989), 188 Ill. App. 3d 142, 544 N.E.2d 24.) And even more egregious, Judith brought charges of sexual abuse and satanic cult practice against Donald without presenting evidence to substantiate the charges. As a result of Judith's actions and pleadings, Donald had to incur significant attorney fees and costs to defend himself and Marc's attorney likewise expended a great amount of time in defending Marc's welfare in these actions.

Accordingly, based upon the record as a whole, we find no abuse of discretion on the part of the trial court in apportioning the attorney fee award.

For the foregoing reasons, the decision of the trial court is affirmed.

Affirmed.

BUCKLEY, P.J., and O'CONNOR, J., concur.